[No. D014154. Fourth Dist., Div. One. Sept. 9, 1991.]

LINDA KAY AGUILAR et al., Plaintiffs and Appellants, v.
ASSOCIATION FOR RETARDED CITIZENS, Defendant and Respondent.

22

**COUNSEL**

Stuart M. Kaye for Plaintiffs and Appellants.

Littler, Mendelson, Fastiff & Tichy, Scott A. Wilson and Jody A. Landry for Defendant and Respondent.

**OPINION**

**KREMER, P. J.**—The issue in this case is whether the Association for Retarded Citizens (ARC) is required to pay employees who work less than 24-hour shifts for time when the employees are allowed to sleep. We conclude ARC is required to compensate the employees for all the hours

they are subject to ARC's control, including hours when the employees are allowed to sleep.

## FACTS

ARC is a state-funded, nonprofit organization which provides care for mentally handicapped individuals throughout the Imperial Valley. ARC operates group homes for these mentally handicapped individuals. ARC employs individuals at the group homes to stay with the mentally handicapped individuals, overseeing their housekeeping, meals, homework and other needs.

The employees involved in this case worked a four-day work week with four days on and three days off. For the first two days of their work week, employees would arrive at 2 p.m. and work until 10 p.m., an eight-hour shift. ARC then required the employees to stay at the group home for an overnight work shift. From 10 p.m. to 6 a.m., the employees were on call but ARC allowed them to sleep. Typically, ARC provided a bed or sofa bed in the group home's study room for the employee to sleep. This room also generally contained a telephone.

From 6 a.m. until 9 a.m., the employees actively worked, helping home residents with their morning routines and preparing them for school. The employees were then free to pursue their own interests, either on or off the premises, until 2 p.m. when the residents returned from school. For the second two days of the work week, the employees would work from 2 to 10 p.m. and then go home.

ARC paid employees for the overnight work shift if the employees received less than five hours' sleep or spent more than three hours assisting one of the handicapped individuals in the group home. Otherwise the employees would receive no compensation for the 10 p.m. to 6 a.m. shift.

Several ARC employees filed claims with California's Department of Industrial Relations, Division of Labor Standards Enforcement (DLSE) against ARC for unpaid wages, i.e., for excluding sleep time from the number of hours worked. DLSE concluded employees who worked less than 24-hour shifts were entitled to compensation for hours when they were subject to the employer's control even though permitted to sleep. Beginning in 1984, the employees sued ARC in municipal court for unpaid wages. These cases were eventually consolidated.

ARC brought a motion for summary judgment, contending that, as a matter of law, the employees were not entitled to wages for the hours they

spent sleeping at the group home. The municipal court judge granted summary judgment in favor of ARC reasoning the DLSE's policy was an unenforceable regulation which had been adopted without complying with statutory procedures.

The employees appealed to the appellate division of the superior court which affirmed. The appellate division concluded federal law governed and that under the federal law employees who were released for only a few hours a day worked a 24-hour shift and employers were not required to provide sleep time compensation for employees who worked 24-hour shifts. At the employees' request, the appellate division of the superior court certified the case for transfer to this court. We issued an order transferring the case to this court for hearing and decision.

DISCUSSION

I

*The Definition of "Hours Worked"*

Whether sleep time is compensable turns on the interpretation of Wage Order 5-80, section 2(H)[1] which provides:

" 'Hours worked' means the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so and in the case of an employee who is required to reside on the employment premises, that time spent carrying out assigned duties shall be counted as hours worked."

Wage Order 5-80 was promulgated by the Industrial Welfare Commission (IWC) which regulates the wages, hours and working conditions for California employees. (Lab. Code, § 1173.) DLSE is authorized to enforce the IWC's orders. (Lab. Code, §§ 61, 1193.5; *Alcala* v. *Western Ag Enterprises* (1986) 182 Cal.App.3d 546, 551 [227 Cal.Rptr. 453].)

II

*The Division's Interpretation Is Not an Improper Regulation*

ARC contends the division's "interpretation"—that section 2(H) requires ARC to compensate the employees for hours when the employees are

---

[1] All references to regulations are to the Industrial Welfare Commission Wage Order 5-80 unless otherwise specified.

permitted to sleep—is entitled to no weight because it is, in reality, a regulation which was adopted without complying with the Administrative Procedures Act (APA) (Gov. Code, § 11340 et seq.).

The APA establishes "basic minimum procedural requirements for the adoption, amendment or repeal of administrative regulations." (Gov. Code, § 11346.) The APA is "applicable to the exercise of any quasi-legislative power conferred by any statute" but does not affect additional requirements imposed by other statutes. (Gov. Code, § 11346.)

The APA defines a regulation as "every rule, regulation, order, or standard of general application or the amendment, supplement or revision of any such rule, regulation, order or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one which relates only to the internal management of the state agency. 'Regulation' does not mean or include legal rulings of counsel issued by the Franchise Tax Board or State Board of Equalization, or any form prescribed by a state agency or any instructions relating to the use of the form, but this provision is not a limitation upon any requirement that a regulation be adopted pursuant to this part when one is needed to implement the law under which the form is issued." (Gov. Code, § 11342, subd. (b).)

The difference between interpreting a regulation to enforce it and adopting a new regulation was examined in *Skyline Homes, Inc.* v. *Department of Industrial Relations* (1985) 165 Cal.App.3d 239 [211 Cal.Rptr. 792]. An IWC standard required payment of time and one-half the regular rate of pay for overtime. The DLSE concluded an employer was in violation of the standard by reading "regular rate of pay" to mean the result of dividing the weekly straight-time salary by no more than 40 hours. The *Skyline* court rejected the argument the DLSE's action was adoption of a regulation rather than an interpretation of the IWC order.

"The relationship between the DLSE and the IWC is similar to that between the Occupational Safety and Health Standards Board and the Division of Occupational Safety and Health. The division is charged with the power to 'adequately enforce and administer all laws and lawful standards and orders . . .' regarding safety in workplaces [citations]. The standards board, like the IWC, is responsible for adopting standards [citations].

"In the case of *Bendix Forest Products Corp.* v. *Division of Occupational Saf. & Health* (1979) 25 Cal.3d 465 [158 Cal.Rptr. 882, 600 P.2d 1339], the standards board had adopted a regulation providing that hand protection may be required for employees whose work exposes their hands to dangerous

substances, cuts or burns [citation]. Pursuant to this standard the division ordered the employer, a lumber company, to provide hand protection to its employees at company expense. The employer contended that the division was attempting to legislate a new standard and was encroaching on the authority of the standards board. The court held that '[t]he decision of the Division was not a quasi-legislative judgment promulgating a new regulation or standard but rather a specific application of laws and existing regulations. We see no conflict in the exercise of power vis-a-vis the Standards Board.' [Citation.]

"Similarly, in this case, the DLSE is not promulgating regulations. The regulation is wage order 1-76, properly promulgated by the IWC. The DLSE is charged with enforcing the wage orders, and to do so, it must first interpret them. The enforcement policy is precisely that—an interpretation—and need not comply with the APA." (165 Cal.App.3d at p. 253.)

In this case as well the IWC Wage Order was properly applied. DLSE's action here amounted to no more than an interpretation of that Wage Order and its application to a specific situation. DLSE's interpretation did not create a new rule or policy; it construed the words of the IWC Wage Order. The fact DLSE did not adopt ARC's interpretation does not mean that DLSE must have engaged in rule-making rather than interpretation. Adoption of an interpretation consistent with the language and intention of the Wage Order as a prelude to enforcement does not require compliance with the APA.

ARC argues *Armistead* v. *State Personnel Board* (1978) 22 Cal.3d 198 [149 Cal.Rptr. 1, 583 P.2d 744] and *Ligon* v. *State Personnel Bd.* (1981) 123 Cal.App.3d 583 [176 Cal.Rptr. 717], support its position DLSE's interpretation of Wage Order 5-80 was the promulgation of a regulation. In these cases, the State Personnel Board adopted new rules or policies applicable to state employees.

In *Armistead* v. *State Personnel Board, supra,* 22 Cal.3d 198, the State Personnel Board adopted a rule in its personnel transactions manual which did not allow an employee to withdraw his/her resignation at some future date unless the appointing agency gave its approval. This rule contrasted with the board's rule which merely stated that an employee could resign by submitting a written resignation to the appointing power. The Supreme Court found the rule in the Personnel Transaction Manual was a regulation which had not been adopted in compliance with the APA.

In *Ligon* v. *State Personnel Bd., supra,* 123 Cal.App.3d 583, the executive officer of the State Personnel Board had issued a memorandum with an

attached document entitled "State Personnel Board Procedures Regarding Claims of Out-of-Class Experience" which provided the procedures and standards for accepting out-of-class experience for advancement to other positions. The policy was intended to be generally applied in every case and serve as a general limitation on the use of out-of-class experience to meet minimum requirements. The appellate court concluded the board's policy was a regulation.

In both these cases, the State Personnel Board adopted *new* rules broadly applicable to state employees. In *Armistead*, the board created *new* conditions on employee resignations. In *Ligon*, the board created *new* rules for considering out-of-class experience. Neither case involved a challenge to an application of a preexisting regulation; the cases involved challenges to new rules enacted by the State Personnel Board. Here, unlike the *Armistead* and *Ligon* cases, DLSE did not enact a new rule applicable generally to a broad class of people. DLSE did not create new rules for determining employee compensation. DLSE interpreted and applied a preexisting IWC regulation to a particular situation.

### III

### *Interpretation of the Wage Order*

Alternatively, ARC argues we should affirm because DLSE's interpretation of the Wage Order was unreasonable and therefore unenforceable.

As a general rule, the courts defer to the agency charged with enforcing a regulation when interpreting a regulation because the agency possesses expertise in the subject area. (*C.E. Buggy, Inc.* v. *Occupational Safety & Health Appeals Bd.* (1989) 213 Cal.App.3d 1150, 1156 [261 Cal.Rptr. 915].) However, final responsibility for interpreting a statute or regulation rests with the courts and a court will not accept an agency interpretation which is clearly erroneous or unreasonable. (See *City of Anaheim* v. *Workers' Comp. Appeals Bd.* (1981) 124 Cal.App.3d 609, 613 [177 Cal.Rptr. 441]; *Alcala* v. *Western Ag Enterprises, supra*, 182 Cal.App.3d 546, 551.)

The fundamental rule of construing a statute or regulation is ascertaining the intent of the regulation so as to effectuate the purpose of the law. (See *T.M. Cobb Co.* v. *Superior Court* (1984) 36 Cal.3d 273, 277 [204 Cal.Rptr. 143, 682 P.2d 338].) To determine the intent, the court turns first to the words, attempting to give effect to the usual, ordinary import of the

language and to avoid making any language mere surplusage. (*Regents of University of California* v. *Public Employment Relations Bd.* (1986) 41 Cal.3d 601, 607 [224 Cal.Rptr. 631, 715 P.2d 590]; *Fontana Unified School Dist.* v. *Burman* (1988) 45 Cal.3d 208, 219 [246 Cal.Rptr. 733, 753 P.2d 689].) The words must be construed in context in light of the nature and obvious purpose of the regulation where they appear. (See *Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 658-659 [147 Cal.Rptr. 359, 580 P.2d 1155].) The various parts of an enactment must be harmonized in context of the framework as a whole. (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230-231 [110 Cal.Rptr. 144, 514 P.2d 1224]; *Long Beach Police Officers Assn.* v. *City of Long Beach* (1988) 46 Cal.3d 736, 746 [250 Cal.Rptr. 869, 759 P.2d 504].) The regulation must be given a reasonable and common sense interpretation consistent with the apparent purpose and intention of the agency, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity. (See *Beaty* v. *Imperial Irrigation Dist.* (1986) 186 Cal.App.3d 897, 902 [231 Cal.Rptr. 128]; see also *Webster* v. *Superior Court* (1988) 46 Cal.3d 338, 344 [250 Cal.Rptr. 268, 758 P.2d 596].)

 Wage Order 5-80 classifies the ARC employees as "personal attendants." (§ 2(K).)[2] As ARC points out, section 3(D)[3] of the Wage Order specifically excludes personal attendants from the normal working hour limitations of eight hours per day and forty hours per week before overtime is required. Instead, a personal attendant may be employed for up to 54 hours and up to 6 days per week at the employee's regular rate of pay. Section 3(D) allows personal attendants to be employed for more than 54 hours or 6 days in a work week if they are compensated for all hours over 54 hours and 6 days at not less than one and one-half times the employee's regular pay rate. The Wage Order, does not, however, specifically address sleep time for personal attendants.

---

[2]Section 2(K) states: " 'Personal attendant' includes baby sitters and means any person employed by a non-profit organization covered by this order to supervise, feed or dress a child or person who by reason of advanced age, physical disability or mental deficiency needs supervision. The status of 'personal attendant' shall apply when no significant amount of work other than the foregoing is required."

[3]Section 3 generally requires employers to pay one and one-half times the employee's regular rate of pay for hours in excess of eight hours a day or forty hours a week. Section 3(D) provides: "This section does not apply to personal attendants as defined in Section 2(K), . . . ; provided that persons employed in such occupations shall not be employed more than fifty-four (54) hours nor more than six (6) days in any workweek, except under the following conditions:

"In case of emergency, employees may be employed in excess of fifty-four (54) hours or six (6) days in any workweek provided the employee is compensated for all hours in excess of fifty-four (54) hours and six (6) days in the workweek at not less than one and one-half 1½ times the employee's regular rate of pay."

Sleep time is addressed in section 3(J) of the Wage Order.[4] It provides sleep and meal times may be excluded from daily hours worked for ambulance drivers and attendants scheduled to work 24-hour shifts if the employer provides adequate dormitory and kitchen facilities for those employees.

Based on sections 3(D) and 3(J), ARC argues that given the extended hours permitted for personal attendants and the lack of specific provisions addressing sleep time for personal attendants working less than 24-hour shifts, the Wage Order ought to be interpreted to exempt sleep time for employees who are "temporarily released" during a 24-hour period. ARC argues:

"The DLSE's interpretation of the Order to require payment of sleep time to all employees working shifts less than 24 hours, and that the release of employees for a few hours during the shift to pursue personal interests each day would prevent a finding that the employee works a 24-hour shift, cannot logically be inferred from reading the Order. Therefore, such an interpretation, without advance written notice to employers is unreasonable and should not be enforced."

In other words, ARC argues DLSE's interpretation is unreasonable because DLSE did not treat the ARC employees under the rule applying to 24-hour shifts. We, however, find nothing unreasonable in DLSE's analysis. Wage Order 5-80 generally provides "hours worked" for which compensation must be paid includes the hours when an employee "is subject to the control of an employer," including "all the time the employee is suffered or permitted to work whether or not required to do so . . . ." This broad definition clearly includes time when an employee is required to be at the employer's premises and subject to the employer's control even though the employee was allowed to sleep. ARC does not contest this construction. Rather, ARC argues an exemption from "hours worked" compensation rule applies to the employees here. We disagree.

First, the IWC Wage Order clearly distinguishes between employees who work 24-hour shifts and those who work less than 24-hour shifts. The Wage Order expressly provides an exemption from compensation for sleep time only for employees who work 24-hour shifts. The record is clear the employees here do not work 24-hour shifts.

[4]Section 3(J) provides: "The daily overtime provisions of subsection (A) above shall not apply to ambulance drivers and attendants scheduled for twenty-four (24) hour shifts of duty who have agreed in writing to exclude from daily time worked not more than three (3) meal periods of not more than one hour each and a regularly scheduled uninterrupted sleeping period of not more than eight (8) hours. The employer shall provide adequate dormitory and kitchen facilities for employees on such a schedule."

Second, we do not find ARC's characterization of the shifts as being 24-hour shifts with the employees being "temporar[ily] release[d] . . . to attend to personal interests" to be persuasive. ARC's characterization would abrogate the distinction between employees working 24-hour shifts and those working less than 24-hour shifts. Under ARC's analysis, all employees in the work force could be characterized as working 24-hour shifts, with the only variation being the length of the "temporary release . . . to attend to personal interests." An accountant who worked 8 hours a day could be viewed as working a 24-hour shift with a 16-hour temporary release period.

ARC's interpretation requires a noncommonsense interpretation of the words; if IWC had intended the interpretation that ARC urges—that employers do not have to compensate employees working 17-hour shifts for sleep time—IWC easily could have so provided. They, however, did not. We conclude the employees here are entitled to compensation for all the hours worked; ARC is not entitled to deduct those hours when it allows the employees to sleep.[5]

IV

*Department of Labor's Interpretation*

ARC contends federal Department of Labor's (DOL) published interpretation of the same term must govern.

■ Federal interpretations of federal labor laws may provide persuasive authority for interpreting state law; with the persuasiveness of federal authority being less when the state law differs from the federal. (See *Alcala* v. *Western Ag Enterprises*, *supra*, 182 Cal.App.3d 546, 550-551.)[6]

Here, ARC wrote to DOL in 1981 and 1985, seeking advice on compensation for sleep time. In 1981 the division responded as follows:

"Your third and final question related to employees who do not reside at the community residences but who, as relief employees, remain there for at least 24 hours and often as long as two or three days. You have informed us

---

[5]We need not address ARC's additional contention DLSE's "policy" was unenforceable because it was not reduced to writing (see Lab. Code, §§ 8, 1198.4) because this contention has been mooted by our judicial construction of the Wage Order.

[6]The employees, citing a United States Supreme Court case, argue the federal definition of "hours worked" differs from the state definition because the federal definition includes the time when the employees are subject to the employer's control *and on duty*. (See *Anderson* v. *Mt. Clemens Pottery Co.* (1946) 328 U.S. 680, 690-691 [90 L Ed 1515, 1524-1525, 66 S.Ct. 1187], superseded in part by 29 U.S.C. § 251 et seq.)

that these relief employees, during a 24-hour period, have off-duty time during the day with complete freedom from all responsibilities, thereby enabling them to use the time effectively for their own purposes. Such employees, as you have pointed out, are arguably on duty for less than 24 hours. Your specific question is whether the sleep time of such employees can be deducted from working time.

"Under the particular circumstances you have described, we believe that such sleep time can be deducted from hours worked, provided that the employer and employees agree in advance to do so, and that no more than 8 hours per night (or actual, uninterrupted sleeptime, if that is less than 8 hours) is deducted. We have reached this conclusion, which represents a departure from the general rule under 29 CFR 785.21, because of the *home-like environment* afforded to these employees in community residences, with private quarters and other amenities. Even where employees sleep over for only one or two nights, there are ample facilities to enable them to get a full night's sleep."

In 1985, the division reaffirmed this position, pointing out that under federal law sleeping time is generally compensable unless it falls within two exceptions: (1) if the employee is on duty for 24 hours or more or (2) if the employee resides on the employer's premises. The department concluded the ARC employees' sleep time was not compensable, explaining:

"[B]ecause of the special circumstances that prevail in community residences, and because relief employees perform essentially the same duties as regular full-time employees, the same 'hours worked' principles should be applied to both categories of employees. Specifically, we see no sound policy reasons for linking allowable sleeping time in the case of relief employees to a more stringent restriction of off-duty time than is the case with regular full-time employees. Therefore, it is our opinion that, in situations where a community residence employs one or more full-time employees who reside on the employer's premises on a permanent basis or for extended periods of time, the employer and a relief employee who performs essentially the same duties as such full-time employees may agree, in advance of the performance of any work, that sleeping time of up to eight hours can be excluded from compensable hours of work, regardless of the length of the tour of duty involved."

We first observe the division's interpretation, like ARC's interpretation, rests on ignoring a clear intent to distinguish between employees working

24-hour shifts and those working less than 24-hour shifts.[7] The division's decision to ignore the plain words and intent of the federal law, in our opinion, makes its interpretation unpersuasive.

We also find unpersuasive DOL's reasoning that the "home-like" environment provided by ARC merits an exemption from the rules requiring compensation for employees working less than 24-hour shifts. While it may be true the community residences provide a home-like environment; that environment is for the benefit of the residents. The relief employees involved in this case have a home elsewhere. The provision of a room containing a bed or sofa bed and telephone does not equate to a "home-like environment;" it is, at best, the provision of an employee sleeping room.[8] We do not find the existence of any "home-like environment" justifying departure from the general rules requiring sleep time compensation.

Nor are we persuaded an exemption from the usual compensation rules should be applied because the employees performed similar duties to the "full-time" employees. The employees involved in this case and "full-time" employees while performing similar duties are differently situated. The full-time employees described by DOL work 24-hour shifts, are subject to a specific exemption and do have a "home-like environment" at the community residence because the group home is essentially their home.[9] The

---

[7]See 29 Code of Federal Regulations, section 785.21 (1991), stating:

"An employee who is required to be on duty for less than 24 hours is working even though he is permitted to sleep or engage in other personal activities when not busy. A telephone operator, for example, who is required to be on duty for specified hours is working even though she is permitted to sleep when not busy answering calls. It makes no difference that she is furnished facilities for sleeping. Her time is given to her employer. She is required to be on duty and the time is worktime. [Citations.]" Compare 29 Code of Federal Regulations, section 785.22 (1991), addressing 24-hour shifts.

[8]We note the record indicates the room ARC provided for the employees to sleep typically was the study room of the community residence, not a special room used solely by the employees for sleeping.

[9]In its August 1981 letter, the DOL noted: "Many of these houseparents maintain permanent residences elsewhere in the community, but others have as their only residence the facility for the mentally retarded. The *relief staff* may stay overnight at the facility one or two nights a week, and they maintain permanent residences elsewhere.

" . . . . . . . . . . . . . . . . . . . . . . . .

"Your first question is whether a community home employee who maintains a separate residence is prevented, by that fact alone, from qualifying as an employee 'who resides on his employer's premises . . . for extended periods of time' within the meaning of 29 CFR 785.23. The maintenance of a separate residence would not, in itself, disqualify the employee from meeting this test. In general, we take the position that employees who reside on their employer's premises five days a week are considered to reside there 'for extended periods of time.' Where the facilities offered by the employer provide a home-like environment with private quarters separate from the residents of the group home, we would regard such

employees here work less than 24-hour shifts and have a home elsewhere. These different situations merit different treatments under both state and federal law.

■ Finally, even if we were persuaded by the division's interpretation, federal law does not control unless it is more beneficial to employees than the state law. (29 U.S.C. § 218.) ARC argues the federal law is more beneficial than "DLSE's rigid application of its '24-hour' and 'no-release' rules." Here, the state rule is clearly more beneficial to employees in compensating these employees for all the hours they are subject to ARC's control, including the hours during the overnight workshift when they are allowed to sleep.

ARC argues the state rule is not more beneficial than the federal rule by speculating that as a result of the rule, employers will not give employees any release time and employees will deprive themselves of sleep so they can attend to personal interests. While it may be true that under our interpretation, ARC may provide the employees with less "release time" because ARC may opt to place the employees on full 24-hour shifts, we do not think it likely that employees, who work only two 24-hour shifts per week are likely to attend to personal interests and errands during their sleeptime, an overnight shift occurring between 10 p.m. and 6 a.m. Further, nothing in the California rule prohibits an employer from granting an employee time to attend to personal matters on an as-needed basis. Just as an employee working an eight-hour workshift may obtain time off for a personal matter such as a dentist appointment, an employee working a twenty-four-hour workshift presumably may also obtain time to attend to personal matters if necessary. ARC's argument also ignores the fact that the exemption for compensation for sleep time for employees working 24-hour shifts is not automatic; the employers and employees must agree "in writing to exclude from daily time worked . . . a regularly scheduled uninterrupted sleeping period of not more than eight (8) hours." (§ 3(J).) ARC may not unilaterally eliminate compensation for hours when the employees are allowed to sleep by extending the shift to 24-hours; the employees must agree to no compensation for the hours when they are permitted to sleep. Since compensation for a sleep period is required unless there is a contrary written agreement; an employer does not have an automatic incentive to impose a 24-hour shift on

---

employees as residing there, even though they may have another residence which they may regard as their principal residence. In light of the amount of time they spend at the group home, it is in effect a second residence.

" . . . . . . . . . . . . . . . . . .
"Your third and final question related to employees who do not reside at the community residences but who, as relief employees, remain there for at least 24 hours, and often as long as two or three days. . . ."

employees to avoid sleep time compensation. Enforcement of the sleep time compensation rule for employees working less than 24-hour shifts thus will not inexorably lead to 24-hour shifts, the loss of "release time" or employees depriving themselves of sleep to take care of personal matters.

We conclude the federal rule is not controlling and must yield to the state law.

### DISPOSITION

The judgment is reversed. Costs to the employees.

Work, J., and Froehlich, J., concurred.