Filed 1/8/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| TIM MENDIOLA et al., | ) | |
| | ) | |
| Plaintiffs, Cross-defendants and Respondents, | ) ) | |
| | ) | S212704 |
| v. | ) | |
| | ) | Ct.App. 2/4 B240519 |
| CPS SECURITY SOLUTIONS, INC., et al., | ) | |
| | ) | (Los Angeles County |
| Defendants, Cross-complainants and Appellants. | ) ) ) | Super. Ct. No. BC388956) |
| _____ | ) | |
| | ) | |
| FLORIANO ACOSTA et al., | ) | |
| | ) | |
| Plaintiffs, Cross-defendants and Respondents, | ) ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CPS SECURITY SOLUTIONS, INC., et al., | ) | (Los Angeles County |
| | ) | Super. Ct. No. BC391669) |
| Defendants, Cross-complainants and Appellants. | ) ) ) | |
| _____ | ) | |

Here we hold that, under the California wage order covering security guards, these plaintiffs are entitled to compensation for all on-call hours spent at their assigned worksites under their employer's control.

1

## I. BACKGROUND

The relevant facts are not in dispute.[1]  As applicable here,[2] CPS employed on-call guards[3] to provide security at construction worksites.  Part of each guard's day was spent on active patrol.  Each evening, guards were required to be on call at the worksite and to respond to disturbances should the need arise.

More specifically, a guard's obligations differed depending on the day of the week.  On weekdays, each guard was on patrol for eight hours, on call for eight hours, and off duty for eight hours.  On weekends, each guard was on patrol for 16 hours and on call for eight hours.

By written agreement, an on-call guard was required to reside in a trailer provided by CPS.  The trailers ranged from 150 to 200 square feet and had residential amenities including a bed, bathroom, kitchen, heating, and air conditioning.  Only the assigned guard and maintenance staff had keys to these onsite trailers.  Guards could keep personal items in the trailers and generally use on-call time as they chose.  However, children, pets, and alcohol were not allowed, and adult visitors were permitted only with the approval of the CPS client.

An on-call guard wanting to leave the worksite had to notify a dispatcher and indicate where he or she would be and for how long.  If another employee was available for relief, the guard had to wait onsite until the reliever arrived.[4]  If no

---

[1]    The facts are taken from the Court of Appeal's opinion and the joint statement of undisputed facts.

[2]    Defendants, CPS Security Solutions, Inc., CPS Construction Protection Security Plus, Inc., and Construction Protective Services, Inc., are referred to as "CPS."

[3]    CPS also employed guards who only worked shifts with no on-call responsibilities.  This case involves only on-call guards.

[4]    Relievers were paid for filling in.

2

reliever was available, the guard had to remain onsite, even in the case of a personal emergency. If relieved, a guard had to be accessible by pager or radio phone and to stay close enough to the site to return within 30 minutes.

Guards were compensated as follows. They were paid hourly for time spent patrolling the worksite. They *received no compensation* for on-call time unless (1) an alarm or other circumstances required that they conduct an investigation or (2) they waited for, or had been denied, a reliever. Guards were paid for the actual time spent investigating disturbances. If three or more hours of investigation were required during on-call time, the guard was paid for the full eight hours.

Two class action lawsuits were filed in 2008 by CPS guards. The complaints alleged, inter alia, that CPS's on-call compensation policy violated minimum wage and overtime obligations imposed by the applicable Industrial Welfare Commission (IWC) wage order and Labor Code statutes.[5] The trial court consolidated the cases and certified the class. Both sides sought declaratory relief as to the lawfulness of CPS's on-call compensation policy. The parties filed cross-motions for summary adjudication of the declaratory relief claims.

The trial court granted plaintiffs' motion, concluding that CPS's compensation policy violated Wage Order 4. Citing the extent of CPS's control during on-call hours and the fact that the guards' presence on worksites primarily benefitted CPS, the court concluded that the on-call hours constituted compensable "hours worked" within the meaning of the wage order. CPS sought

---

[5] The parties stipulated that IWC wage order No. 4-2001 (Cal. Code Regs., tit. 8, § 11040 (Wage Order 4)), which applies to all persons employed in professional, technical, clerical, mechanical, and similar occupations, governs here. (*Id.*, subd. 2(O) [listing "guards" as included occupation].)

review.  The Court of Appeal affirmed in part and reversed in part.  Both parties petitioned for review.

We conclude that plaintiffs' on-call hours constituted compensable hours worked and, further, that CPS could not exclude "sleep time" from plaintiffs' 24-hour shifts under *Monzon v. Schaefer Ambulance Service, Inc.* (1990) 224 Cal.App.3d 16 (*Monzon*) and *Seymore v. Metson Marine, Inc.* (2011) 194 Cal.App.4th 361 (*Seymore*).

## II.  DISCUSSION

We have explained that "wage and hour claims are today governed by two complementary and occasionally overlapping sources of authority:  the provisions of the Labor Code, enacted by the Legislature, and a series of 18 wage orders, adopted by the IWC."  (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1026 (*Brinker*).)  The IWC, a state agency, was empowered to issue wage orders, which are legislative regulations specifying minimum requirements with respect to wages, hours, and working conditions.[6]  (*Brinker*, at pp. 1026-1027; see *Martinez v. Combs* (2010) 49 Cal.4th 35, 52-57 (*Martinez*).)  Of the 18 wage orders in effect today, "16 cover[] specific industries and occupations, one cover[s] all employees not covered by an industry or occupation order, and a general minimum wage order amend[s] all others to conform to the amount of the minimum wage currently set by statute."  (*Martinez*, at p. 57, fns. omitted.)  The number of wage orders, and their internal variations, reflects the reality that differing aspects of work in differing industries may call for different kinds of regulation.

---

[6]    The Legislature defunded the IWC in 2004, but its wage orders remain in effect.  (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1102, fn. 4 (*Murphy*); Lab. Code, § 1182.13, subd. (b).)

4

Wage Order 4 requires that employers "pay to each employee . . . not less than the applicable minimum wage for all *hours worked* in the payroll period . . . ." (Wage Order 4, subd. 4(B), italics added.) It also requires that employees be paid one and one-half times their regular rate of pay for "all *hours worked* over 40 hours in the workweek" (*id.*, subd. 3(A)(1), italics added) and for "all *hours worked* in excess of eight (8) hours . . . in any workday" (*id.*, subd. 3(A)(1)(a), italics added).[7] The resolution of this case turns, in part, on whether the time spent on call constituted hours worked within the meaning of the wage order.

Wage Order 4 defines hours worked as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so."[8] (Wage Order 4, subd. 2(K).) In *Morillion*, we explained that "the two phrases — 'time during

_____

[7] Wage Order 4 also requires that employees be paid one and one-half times their regular rate of pay "for the first eight (8) hours worked on the seventh (7th) consecutive day of work in a workweek" (*id.*, subd. 3(A)(1)(a)) and "[d]ouble the . . . regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours worked in excess of eight (8) hours on the seventh (7th) consecutive day of work in a workweek" (*id.*, subd. 3(A)(1)(b)).

[8] All industry-specific wage orders contain the same definition of hours worked except Wage Order 4 and IWC wage order No. 5-2001 (Cal. Code Regs., tit. 8, § 11050 (Wage Order 5)), both of which include additional language. (*Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 581 (*Morillion*).) Wage Order 4's definition contains a second sentence: "Within the health care industry, the term 'hours worked' means the time during which an employee is suffered or permitted to work for the employer, whether or not required to do so, as interpreted in accordance with the provisions of the [federal] Fair Labor Standards Act." (Wage Order 4, subd. 2(K).) Wage Order 5 applies to persons employed in the public housekeeping industry. (Wage Order 5, subd. 1.) Its definition of hours worked includes (1) the "control" and "suffered or permitted" language common to all wage orders, (2) the health care industry language that appears in Wage Order 4, and (3) language providing that, "in the case of an employee who is required to reside on the employment premises, that time spent carrying out assigned duties shall be counted as hours worked." (Wage Order 5, subd. 2(K).)

5

which an employee is subject to the control of an employer' and 'time the employee is suffered or permitted to work, whether or not required to do so' " can be viewed "as independent factors, each of which defines whether certain time spent is compensable as 'hours worked.' Thus, an employee who is subject to an employer's control does not have to be working during that time to be compensated . . . ." (*Morillion*, *supra*, 22 Cal.4th at p. 582.)

We independently review the construction of statutes (*Kirby v. Immoos Fire Protection, Inc.* (2012) 53 Cal.4th 1244, 1250), and begin with the text. If it "is clear and unambiguous our inquiry ends." (*Murphy*, *supra*, 40 Cal.4th at p. 1103.) Wage and hour laws are "to be construed so as to promote employee protection." (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 340; see *Brinker*, *supra*, 53 Cal.4th at pp. 1026-1027.) These principles apply equally to the construction of wage orders. (*Brinker*, at p. 1027.) Additionally, when the relevant facts are not in dispute, what qualifies as hours worked is a question of law, reviewed de novo. (See *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 794.)

Hours Worked

It is well established that an employee's on-call or standby time may require compensation. "Of course an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity. Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer." (*Armour & Co. v. Wantock* (1944) 323 U.S. 126, 133; see *Skidmore v. Swift & Co.* (1944) 323 U.S. 134, 137 ["Facts may show that the employee was engaged to wait, or they may show that he waited to be engaged."]; *Madera Police*

6

*Officers Assn. v. City of Madera* (1984) 36 Cal.3d 403, 406 (*Madera*) [concluding officers' on-call mealtime was compensable hours worked].)

California courts considering whether on-call time constitutes hours worked have primarily focused on the extent of the employer's control. (E.g., *Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524, 1535 (*Ghazaryan*); *Bono Enterprises, Inc. v. Bradshaw* (1995) 32 Cal.App.4th 968, 974-975 (*Bono*), disapproved on other grounds in *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 573-574.) Indeed, we have stated that "[t]he level of the employer's control over its employees . . . is determinative" in resolving the issue. (*Morillion*, *supra*, 22 Cal.4th at p. 587.) " 'When an employer directs, commands or restrains an employee from leaving the work place . . . and thus prevents the employee from using the time effectively for his or her own purposes, that employee remains subject to the employer's control. According to [the definition of hours worked], that employee must be paid.' " (*Id.* at p. 583.)

Courts have identified various factors bearing on an employer's control during on-call time: " '(1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.' ([*Owens v. Local No. 169* (9th Cir. 1992) 971 F.2d 347,] 351, fns. omitted.)" (*Gomez v. Lincare, Inc.* (2009) 173 Cal.App.4th 508, 523-524 (*Gomez*).) **9** Courts have also taken into account

---

**9** *Gomez* also identified the parties' agreement as a factor to consider when determining whether on-call time constitutes hours worked. (*Gomez*, *supra*, 173

*(footnote continued on next page)*

7

whether the "[o]n-call waiting time . . . is spent primarily for the benefit of the employer and its business." (*Gomez*, at p. 523; see *Madera*, *supra*, 36 Cal.3d at p. 409; *Ghazaryan*, *supra*, 169 Cal.App.4th at p. 1535.) Here, the Court of Appeal properly concluded that the "guards' on-call hours represent hours worked for purposes of Wage Order No. 4."

The guards here were required to "reside" in their trailers as a condition of employment and spend on-call hours in their trailers or elsewhere at the worksite. They were obliged to respond, immediately and in uniform, if they were contacted by a dispatcher or became aware of suspicious activity. Guards could not easily trade on-call responsibilities. They could only request relief from a dispatcher and wait to see if a reliever was available. If no relief could be secured, as happened on occasion, guards could not leave the worksite. CPS exerted control in a variety of other ways. Even if relieved, guards had to report where they were going, were subject to recall, and could be no more than 30 minutes away from the site. Restrictions were placed on nonemployee visitors, pets, and alcohol use.

Additionally, the Court of Appeal correctly determined that the guards' on-call time was spent primarily for the benefit of CPS. The parties stipulated that "CPS's business model is based on the idea that construction sites should have an active security presence during the morning and evening hours when construction

---

*(footnote continued from previous page)*

Cal.App.4th at p. 523.) The court in *Ghazaryan* came to a contrary conclusion. "[U]nder California law 'the existence of an "agreement" regarding the understanding of the parties [as to the compensation policy] is of no importance. The ultimate consideration in applying the California law is determining the extent of the "control" exercised.' " (*Ghazaryan*, *supra*, 169 Cal.App.4th at p. 1535, fn. 10; see Lab. Code, § 1194, subd. (a) ["[n]otwithstanding any agreement to work for a lesser wage . . ."].) We need not resolve that conflict here.

8

workers arrive and depart the site, but that theft and vandalism during the night and weekend hours can be deterred effectively by the mere presence of a security guard in a residential trailer." Thus, even when not actively responding to disturbances, guards' "mere presence" was integral to CPS's business. Indeed, the parties also stipulated that CPS would have been in breach of its service agreement had a guard or reliever not been at the worksite during all contracted for hours.[10]

*CPS's Arguments*

CPS notes that on-call guards engaged in personal activities, including sleeping, showering, eating, reading, watching television, and browsing the Internet. Although relevant, this fact does not compel a different conclusion. *Morillion* held that time spent traveling to and from work on employer-provided buses constituted compensable hours worked. (*Morillion*, *supra*, 22 Cal.4th at p. 578.) It rejected the employer's claim "that plaintiffs were not under its control during the required bus ride because they could read on the bus, or perform other personal activities. . . . Allowing plaintiffs the circumscribed activities of reading or sleeping does not affect, much less eliminate, the control [the employer] exercises by requiring them to travel on its buses . . . . Similarly, as one amicus curiae suggests, listening to music and drinking coffee while working in an office setting can also be characterized as personal activities, which would not otherwise render the time working noncompensable." (*Id.* at p. 586; see *Bono*, *supra*, 32 Cal.App.4th at pp. 971-972 [time employee is required to remain at workplace

---

**10** Employees sent to a worksite to relieve an on-call guard were paid even if events did not require that they investigate a disturbance. This policy meant that an on-call guard who performed no investigation, and had not asked to be relieved, was not paid, but a reliever doing the same *was* paid. This reality supports the conclusion that guards were "engaged to wait, [not] . . . wait[ing] to be engaged." (*Skidmore v. Swift & Co.*, *supra*, 323 U.S. at p. 137.)

9

during lunch constitutes hours worked even when relieved of all job duties];
*Aguilar v. Association for Retarded Citizens* (1991) 234 Cal.App.3d 21, 30
(*Aguilar*) [time employee is required to remain at workplace is hours worked even
if permitted to sleep].) So too here. The fact that guards could engage in limited
personal activities does not lessen the extent of CPS's control. It is the extent of
employer control here that renders on-call time compensable hours worked under
Wage Order 4.

In arguing against this result, CPS urges that we should incorporate 29
Code of Federal Regulations part 785.23 (part 785.23)[11] into Wage Order 4 by
implication. As relevant here, part 785.23 provides, "An employee who resides on
his employer's premises on a permanent basis or for extended periods of time is
not considered as working all the time he is on the premises. Ordinarily, he may
engage in normal private pursuits and thus have enough time for eating, sleeping,
entertaining, and other periods of complete freedom from all duties when he may
leave the premises for purposes of his own. It is, of course, difficult to determine
the exact hours worked under these circumstances and any reasonable agreement
of the parties which takes into consideration all of the pertinent facts will be
accepted." CPS contends that, under this federal approach, its treatment of on-call
time as generally uncompensated "free time" should be deemed lawful.[12] The
Court of Appeal correctly rejected this argument.

---

[11]     Title 29 Code of Federal Regulations part 785 et seq. contains regulations
concerning what constitutes hours worked within the meaning of the Fair Labor
Standards Act of 1938 (29 U.S.C. § 201 et seq. (FLSA)).

[12]     The Court of Appeal concluded that, even if incorporated, part 785.23 did
not apply to these facts. We need not address this point.

Federal regulations provide a level of employee protection that a state may not derogate. Nevertheless, California is free to offer greater protection. We have stated that, "[a]bsent convincing evidence of the IWC's intent to adopt the federal standard for determining whether time . . . is compensable under state law, we decline to import any federal standard, which expressly eliminates substantial protections to employees, by implication." (*Morillion*, *supra*, 22 Cal.4th at p. 592.) More recently, we have "cautioned against 'confounding federal and state labor law' [citation] and explained 'that where the language or intent of state and federal labor laws substantially differ, reliance on federal regulations or interpretations to construe state regulations is misplaced.' " (*Martinez*, *supra*, 49 Cal.4th at p. 68.)

CPS identifies no analog to part 785.23 in Wage Order 4. By contrast, Wage Order 5, which applies to public housekeeping workers, *does* contain analogous language. Its definition of hours worked provides that, "in the case of an employee who is required to reside on the employment premises, that *time spent carrying out assigned duties* shall be counted as hours worked." (Wage Order 5, subd. 2(K), italics added.) Wage Order 4, as noted, does not contain language limiting hours worked to "time spent carrying out assigned duties." (See *Morillion*, *supra*, 22 Cal.4th at p. 592.)

Furthermore, other language in Wage Order 4 demonstrates that the IWC knew how to explicitly incorporate federal law and regulations when it wished to do so. For example, the wage order provides that, *within the health care industry*, hours worked should be interpreted in accordance with the FLSA. (Wage Order 4, subd. 2(K).) But the order makes *no* reference to federal law applying in the case of guards. The language chosen by the IWC does not support CPS's argument that a broad importation was intended. Indeed, it supports the contrary conclusion:

11

The IWC intended to import federal rules only in those circumstances to which the IWC made specific reference.

### The Exclusion of Sleep Time from 24-Hour Shifts

The remaining question is whether sleep time may be excluded from plaintiffs' 24-hour shifts. On this issue, the Court of Appeal relied on *Monzon*, *supra*, 224 Cal.App.3d 16, and *Seymore*, *supra*, 194 Cal.App.4th 361, to conclude that *all* industry-specific wage orders implicitly incorporate a federal regulation that permits the exclusion of eight hours of sleep time from employees' 24-hour shifts. We reject that analysis as fundamentally inconsistent with our opinion in *Morillion*, *supra*, 22 Cal.4th 575.

In *Monzon*, ambulance drivers and attendants sued to recover unpaid overtime compensation. (*Monzon*, *supra*, 224 Cal.App.3d at p. 22.) The workers fell not under Wage Order 4, but instead under IWC wage order No. 9 (Cal. Code Regs., tit. 8, § 11090 (Wage Order 9)). (*Monzon*, at p. 22.) To resolve the case, the *Monzon* court considered whether the parties had lawfully agreed to exclude eight hours of sleep time from otherwise compensable hours worked in a 24-hour shift. (*Ibid*.) Both Wage Orders 4 and 9 impose daily and weekly overtime obligations. (Wage Order 9, subd. 3(A); see *ante*, at p. 5 & fn. 7.) Unlike Wage Order 4, however, Wage Order 9 also contains a narrow exception to its daily overtime provision. The exception states: "The daily overtime provision . . . shall not apply to ambulance drivers and attendants scheduled for 24-hour shifts of duty who have agreed in writing to exclude from daily time worked not more than three (3) meal periods of not more than one (1) hour each and a regularly scheduled uninterrupted sleeping period of not more than eight (8) hours." (Wage Order 9, subd. 3(K); see Wage Order 5, subd. 3(J) [virtually identical provision].)

While Wage Order 9's "sleeping period" exception may be open to several interpretations, the *Monzon* court concluded it did *not* apply in that case because

12

the parties had not entered into a written agreement, which the exception requires. (*Monzon*, *supra*, 224 Cal.App.3d at pp. 40-41.)  The majority nonetheless determined that the parties had lawfully agreed "to exclude sleep time from *compensable time*."**13**  (*Monzon*, at p. 41, italics added.)  It reasoned that the sleeping period exception requiring a written agreement only governs whether the *daily overtime* provision applies; noncompliance with the exception's requirements does not prevent the parties from agreeing that sleep time does not constitute hours worked and thus need not be compensated.  (*Id.* at p. 45.)  In concluding that the parties so agreed, the majority relied upon 29 Code of Federal Regulations part 785.22 (part 785.22).  (*Monzon*, at p. 45.)

Part 785.22(a) provides:  "Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude . . . a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep. . . . Where no expressed or implied agreement to the contrary is present, the 8 hours of sleeping time . . . constitute hours worked."  *Monzon* discussed part 785.22, the history of Wage Order 9's "sleeping period" exception, and the views of the Division of

---

**13**    To be clear, Wage Order 9, subdivision 3(K) allows ambulance drivers and attendants working 24-hours shifts to agree in writing to exclude sleep time from *daily overtime*.  Such an employee would nevertheless receive his or her regular rate of pay for every hour worked as well as overtime for all hours worked over 40 hours in the workweek.  *Monzon*, by comparison, permitted such workers to agree, orally or in writing, to exclude sleep time from *compensable hours worked*.  That is, such employees would be paid nothing for the sleeping period.  The remaining 16 hours would remain subject to Wage Order 9's daily overtime provisions.

13

Labor Standards Enforcement (DLSE).[14]  (*Monzon*, *supra*, 224 Cal.App.3d at pp. 43-45.)  The majority then concluded that the "IWC considers an agreement to exclude sleep time" from hours worked in a 24-hour shift to be "acceptable."  (*Id.* at p. 45.)  Over a dissent (*id.* at pp. 49-50 (conc. & dis. opn. of Johnson, J.)), the majority held that such an agreement need not be in writing.[15]  (*Monzon*, at p. 46; contra, *Aguilar*, *supra*, 234 Cal.App.3d at p. 34.)

*Monzon* is not a paragon of clarity.  At times it appears that its reliance on part 785.22 is based on the similarity between the state and federal definitions of hours worked.  (E.g., *Monzon*, *supra*, 224 Cal.App.3d at pp. 45-46.)  We have subsequently rejected such reasoning.  (*Morillion*, *supra*, 22 Cal.4th at p. 590.)  Alternatively, *Monzon* could be read as basing its reliance on evidence that the IWC intended to adopt the federal standard with regard to ambulance drivers and attendants.  (E.g., *Monzon*, at p. 45.)  Whatever its rationale, *Monzon* dealt solely with ambulance drivers and attendants and made specific reference to the realities of that industry.  The DLSE subsequently recognized the limited scope of *Monzon*'s holding.  (E.g., Dept. Industrial Relations, DLSE Opn. Letter No. 1998.05.29 (May 29, 1998) p. 2.)  At oral argument, plaintiffs' counsel invited us to disapprove *Monzon*.  However, the narrow *Monzon* rule has stood to regulate the compensation of ambulance drivers and attendants for nearly 25 years.  Moreover, its application is not at issue here.  It is sufficient to note that *Monzon*'s holding is limited to its facts.

---

[14]    The DLSE is the state agency empowered to enforce California's labor laws.  (*Morillion*, *supra*, 22 Cal.4th at p. 581.)

[15]    Oddly, this interpretation means an employer needs a written agreement to avoid paying overtime compensation, but does not need a written agreement to avoid paying any compensation at all.

In 2011, *Seymore* substantially expanded *Monzon*'s 1990 holding. In *Seymore*, ship crewmembers, also governed by Wage Order 9, sued to recover unpaid overtime compensation. (*Seymore*, *supra*, 194 Cal.App.4th at pp. 365, 373.) The Court of Appeal considered whether the parties had lawfully agreed to exclude eight hours of sleep time from otherwise compensable hours worked in a 24-hour shift. (*Id.* at p. 365.) Relying on *Monzon*, the court concluded that they had. (*Id.* at pp. 381-382.) The court deemed irrelevant that *Monzon* and Wage Order 9's sleeping period exception both concerned only ambulance drivers and attendants. (*Seymore*, at p. 381.) *Seymore* reasoned that the sleeping period "exemption is not the source of the more general sleep time exclusion; the exclusion of sleep time from compensable hours worked by 24-hour employees is implied from the terms of [part 785.22]." (*Id.* at p. 382.) *Seymore* continued, "[*Monzon*] read into [Wage Order 9] . . . the provisions of the federal regulation, . . . part 785.22" and, unlike Wage Order 9's sleeping period exception, part 785.22 applies to all employees who work 24-hour shifts. (*Seymore*, at p. 382.)

We disapprove *Seymore v. Metson Marine, Inc.*, *supra*, 194 Cal.App.4th 361, as an improper extension of *Monzon*. As we stated in *Morillion*, courts should not incorporate a federal standard concerning what time is compensable "[a]bsent *convincing* evidence of the IWC's intent . . . ." (*Morillion*, *supra*, 22 Cal.4th at p. 592, italics added.) Unlike *Monzon*, which at least could point to some evidence of the IWC's intent concerning ambulance drivers and attendants, *Seymore* identified no such indication, much less convincing evidence, that the IWC intended to permit the exclusion of sleep time from compensable hours worked for *all* employees working 24-hour shifts.

In concluding that CPS and plaintiffs could agree to exclude on-call hours from plaintiffs' 24-hour shifts, the Court of Appeal here cited *Monzon* and *Seymore*, extending *Seymore*'s reasoning to its fullest conclusion. That is, the

15

court below rejected the notion that the ability to exclude sleep time from 24-hour shifts is limited to ambulance drivers and attendants or employees covered by Wage Order 9. "We agree with the courts in *Seymore* and *Monzon* that because the state and federal definitions of hours worked are comparable and have a similar purpose, federal regulations and authorities may properly be consulted to determine whether sleep time may be excluded from 24-hour shifts. Further, we find this determination to be applicable to *all wage orders* that include essentially the same definition of 'hours worked' found in Wage Order No. 9, including Wage Order No. 4." (Italics added.) This conclusion is both sweeping and incorrect.

With regard to the relevance of similarities between state and federal definitions of hours worked, *Morillion* is particularly instructive. In concluding that employees' travel time was compensable under state law, we stated that "we do not believe the similarity or differences between the [state and federal] definitions of 'hours worked' is dispositive of whether plaintiffs' compulsory travel time is compensable under state law." (*Morillion*, *supra*, 22 Cal.4th at p. 590.) The relevant issue in deciding whether the federal standard had been implicitly incorporated was whether state law and the wage order contained an *express exemption* similar to that found in federal law. (*Ibid.*)

Wage Order 4 contains no analog to part 785.22. By contrast, the IWC has adopted similar language in other wage orders. For example, Wage Order 5 provides that, for "[e]mployees with direct responsibility for children who . . . are receiving 24 hour residential care," "[t]ime spent sleeping shall not be included as hours worked."[16] (Wage Order 5, subd. 3(E)(2), (2)(d).) Wage Orders 5 and 9

---

[16] In its statement as to the basis for this provision, the IWC stated that "the definition of 'sleeping' is intended to be consistent with the meaning in the

*(footnote continued on next page)*

16

contain the previously discussed sleeping period exception. (Wage Order 5, subd. 3(J); Wage Order 9, subd. 3(K).) Wage Order 5 also provides that, for employees who are required to reside on the employment premises, hours worked includes "that time spent carrying out assigned duties," which would obviously exclude time spent sleeping. (Wage Order 5, subd. 2(K).)

The absence of language addressing sleep time in Wage Order 4 seriously undermines the notion that the IWC intended to incorporate part 785.22 sotto voce.[17] (See *Morillion*, *supra*, 22 Cal.4th at p. 592.) Because application of part 785.22 would "eliminate[] substantial protections to employees," we decline to import it into Wage Order 4 by implication. (*Morillion*, at p. 592.) A contrary result would have a dramatic impact, particularly in light of the Court of Appeal's conclusion that part 785.22 is implicitly incorporated into all 16 industry-specific wage orders, even though only Wage Orders 5 and 9 contain language providing for the exclusion of sleep time.

---

*(footnote continued from previous page)*

[FLSA] and in the IWC's other wage orders that sleep time is not included in the definition of 'hours worked.' " (IWC, Statement as to the Basis for Amendments to Wage Order No. 5 Regarding Employees Working in Group Homes (Jan. 1, 2002) p. 4.) CPS contends that this means the IWC intended to permit the exclusion of sleep time from hours worked as to *all* wage orders. The argument fails. The meaning of the cited statement is less than clear and could just as easily have been referring to those specific wage orders that explicitly mention the exclusion of sleep time.

[17] We have observed "that where the IWC intended the FLSA to apply to wage orders, it has specifically so stated." (*Morillion*, *supra*, 22 Cal.4th at p. 592.) As previously noted (*ante*, at p. 11), Wage Order 4 itself demonstrates that the IWC knows how to expressly incorporate federal law and regulations when it desires to do so. (E.g., Wage Order 4, subd. 1(A)(1)(e), (2)(f), (3)(e).)

In support of its conclusion, the Court of Appeal also opined that there were "sound reasons for permitting an employer who engages an employee to work a 24-hour shift . . . to exclude . . . eight hours for sleep time . . . . Most employees would be sleeping for a similar period every day, whether on duty or not, and the compensation provided for the other 16 hours . . . ensures that the employees receive an adequate wage." We rejected a nearly identical argument in *Morillion*. (*Morillion*, *supra*, 22 Cal.4th at pp. 587-588 [rejecting the argument that employees would have had to commute anyway].) More importantly, we instructed courts not to "engage in needless policy determinations regarding wage orders the IWC promulgates." (*Ibid.*) Judicial review of " 'wage orders is properly circumscribed. . . . "A reviewing court does not superimpose its own policy judgment upon [the IWC] in the absence of an arbitrary decision . . . ." ' " (*Martinez*, *supra*, 49 Cal.4th at p. 61.)

We recognize that the DLSE has, at various times, seemed to approve CPS's policy of excluding sleep time as complying with state law. In 1996, the DLSE began an investigation into CPS's compensation practices. In a 1997 letter to CPS, the acting labor commissioner concluded that the company could, pursuant to a written agreement, exclude sleep time. That position was subsequently and explicitly disavowed, however, in a 1999 letter to CPS from the newly appointed labor commissioner, and again in a 2002 letter to CPS from the DLSE chief counsel. The 1999 and 2002 letters rejected the position taken in the 1997 letter as incorrect and in conflict with established California law, and also dismissed CPS's reliance on federal regulations. CPS subsequently filed an action for declaratory relief against the labor commissioner, who filed a cross-complaint. Before trial, the parties settled and signed a memorandum of understanding (MOU). Pursuant to the MOU, which expired in 2007, CPS adopted its current

18

compensation policy and the labor commissioner took the position that CPS's policy complied with all applicable wage orders.

The DLSE's past views offer little help in resolving the issue here.[18] Although entitled to consideration and respect, the agency's construction of wage orders is not binding on this court, especially when its stance has been vacillating and contradictory. (*Murphy*, *supra*, 40 Cal.4th at p. 1105, fn. 7.) Moreover, we note that, while the DLSE is charged with administering and enforcing California's labor laws, it is the Legislature and the IWC that possess the authority to enact laws and promulgate wage orders. (*Aguilar*, *supra*, 234 Cal.App.3d at p. 26.)

There is no evidence that the IWC intended to incorporate part 785.22 into Wage Order 4. Accordingly, we conclude that the wage order does not permit the exclusion of sleep time from compensable hours worked in 24-hour shifts covered by Wage Order 4. We express no opinion as what may be required in other circumstances regulated by other wage orders.

---

**18** We acknowledge CPS's efforts to ascertain whether its policy complied with California's labor laws and recognize the difficulty it and other employers can face in this regard. Several factors may contribute to ongoing uncertainty, including the defunding of the IWC and the lack of adequate funding for DLSE enforcement. Such issues, however, must be addressed by the Legislature. At oral argument, CPS's counsel urged that our decision only apply prospectively. "The general rule that judicial decisions are given retroactive effect is basic in our legal tradition." (*Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978.) We see no reason to depart from the general rule here. (*Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 509 [acknowledging the existence of " '*narrow* exceptions to the general rule' " (italics added)].) This is particularly true given that, until *Seymore*, *supra*, 194 Cal.App.4th 361, was decided three years ago, *Monzon*, *supra*, 224 Cal.App.3d 16, was properly interpreted as applying only to ambulance drivers and attendants.

III.  CONCLUSION

We affirm the Court of Appeal's conclusion that plaintiffs' on-call time constituted hours worked within the meaning of Wage Order 4 and was subject to the wage order's minimum wage and overtime provisions.  We reverse the court's conclusion that state and federal regulations permitted CPS to exclude sleep time from plaintiffs' 24-hour shifts.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**
**BAXTER, J.\***
**FYBEL, J.\*\***

_____

\*	Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

\*\*	Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Mendiola v. CPS Security Solutions, Inc.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 217 Cal.App.4th 851
**Rehearing Granted**

_____

**Opinion No.** S212704
**Date Filed:** January 8, 2015

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Jane L. Johnson

_____

**Counsel:**

Blank Rome, Howard M. Knee; and Jim D. Newman for Defendants, Cross-complainants and Appellants.

Law Offices of Cathe L. Caraway-Howard, Cathe L. Caraway-Howard; Natividad Law Firm, Caesar S. Natividad; Locker Folberg and Miles E. Locker for Plaintiffs, Cross-defendants and Respondents.

Hina B. Shah for Women's Employment Rights Clinic of Golden Gate University School of Law, Asian Americans Advancing Justice - Asian Law Caucus, Katharine and George Alexander Community Law Center, Legal Aid Society - Employment Law Center, the Maintenance Cooperation Trust Fund, National Lawyers Guild - Labor and Employment Committee, UC Hastings Civil Justice Clinic, UCLA Labor Center and Worksafe Inc., as Amici Curiae on behalf of Plaintiffs, Cross-defendants and Respondents.

David A. Sanders; Carroll, Burdick & McDonough, Gregg McLean Adam and Jennifer S. Stoughton for California Correctional Peace Officers' Association as Amicus Curiae on behalf of Plaintiffs, Cross-defendants and Respondents.

1

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Howard M. Knee
Blank Rome
2029 Century Park East, 6th Floor
Los Angeles, CA  90067
(424) 239-3400

Jim D. Newman
CPS Security Solutions, Inc.
436 W. Walnut Street
Gardena, CA  90248
(310) 878-8165

Cathe L. Caraway-Howard
Law Offices of Cathe L. Caraway-Howard
8117 Manchester Avenue, Suite 505
Playa Del Rey, CA  90293
(310) 488-9020

Hina B. Shah
Women's Employment Rights Clinic
Golden Gate University School of Law
536 Mission Street
San Francisco, CA  94105-2968
(415) 442-6649