EGERTON, J., Concurring and Dissenting.
I agree we must remand the case for plaintiff and appellant Skylar Ward to pursue a single theory against defendant and respondent Tilly's Inc.: that she reported for work, in person, *1191 but was sent home before her add-on shift and not paid. I otherwise respectfully dissent. The legislative history of the phrase "report for work" reflects the drafters' intent that-to qualify for reporting time pay-a retail salesperson must physically appear at the workplace: the store. As one federal judge has observed, our "fundamental task in interpreting Wage Orders is ascertaining the drafters' intent, not drawing up interpretations that promote the Court's view of good policy." ( Casas v. Victoria's Secret Stores, LLC (C.D.Cal., Dec. 1, 2014, No. CV 14-6412-GW) 2014 WL 12644922, at *5 [nonpub. opn.] ( Casas ).) It is our Legislature's responsibility to enact any necessary legislation to address any hardship to employees who are required to call their employers *480 to discover if they must report for work.
A. Ward's First Amended Complaint
Ward's first amended complaint alleges three kinds of what she terms "on-call shifts": (1) Tilly's schedules the employee for a regular shift followed by an on-call shift. The employee must physically come to work for her regular shift; Tilly's then tells her "during her regular shift whether she also will be required to work her on-call shift." (2) Tilly's schedules the employee for a regular shift preceded by an on-call shift. The employee must contact Tilly's two hours before the on-call shift would start (or by 9:00 p.m. the night before if the on-call shift is scheduled for 10:00 a.m.) to find out if she must work the on-call shift-in other words, if she must come to work two hours before her regular shift. (3) Tilly's schedules the employee for an on-call shift on a day she otherwise is not scheduled to work. The employee must contact Tilly's two hours before the on-call shift would start (or by 9:00 p.m. the night before if the on-call shift is scheduled for 10:00 a.m.) to find out if she must work the on-call shift.
B. On-call Shifts for Which the Employee Never Actually Reports in Person
A version of types two and three of the on-call shifts Ward alleges was at issue in Casas . There, the plaintiffs alleged their employer, a clothing retailer, scheduled them for "call-in shifts." The employer required employees to call in two hours before the shift to find out if they had to report. The retailer moved to dismiss the lawsuit and the court-United States District Judge George Wu-granted the motion. Judge Wu concluded, "[C]all-in shifts do not trigger reporting-time penalties, even if the scheduling practice is inconvenient and employee-unfriendly." ( Casas , supra , 2014 WL 12644922, at *1-2.)
Judge Wu noted the parties read the phrase "report for work" differently. The court stated, "[V]arious dictionaries agree that the verb 'report' means, at *1192 least, 'to present oneself.' " After discussing definitions of "report" and "present" in five different dictionaries, Judge Wu concluded, "Viewed in context, then, the plain meaning of the word 'report' supports [the retailer's] interpretation-that a person 'reports to work'[1 ] by physically showing up at the place ready to work." ( Casas , supra , 2014 WL 12644922, at *3.)
Judge Wu then turned to the legislative history of the wage order. The court noted an earlier version of the wage order, adopted in June 1947, used the phrase "report for work" this way: "No woman employee shall be required to report for work or be dismissed from work between the hours of 10 p.m. and 6 a.m. unless suitable transportation is available ." ( Casas , supra , 2014 WL 12644922, at *4, citing Docket No. 27-1, Ex. D, IWC Wage Order No. 7 R (effective June 1, 1947) [at 91 § 3(c) ].) Judge Wu observed "[t]hat same 1947 Wage Order also included language almost identical to the current reporting-time provisions, stating: 'Each day an employee is required to report for work and does report , but is not put to work or is furnished less than half the usual day's work, said employee shall be paid for half the usual day's work at the employee's regular rate of pay, which shall be not less than the minimum wage herein provided.' " The court continued, "A basic rule of statutory construction states that identical *481 words or phrases used in the same statute bear the same meaning, particularly where they appear in close proximity." ( Id . at *4.) Judge Wu also cited minutes of a 1942 IWC meeting, concluding, "The legislative history therefore strongly suggests that, at least in 1947, the phrase 'report to work' meant physically showing up." ( Ibid . )
Judge Wu continued, "Nothing in the legislative history indicates that the IWC ever altered this meaning. Indeed, the phrase '[e]ach day an employee is required to report for work and does report' has remained unchanged throughout later versions of the Wage Order. This consistency strongly suggests that the IWC intended the phrase 'report for work' to have the same meaning as in prior orders." ( Casas , supra , 2014 WL 12644922, at *5.) Judge Wu stated, "This legislative history is entirely consistent with the Court's earlier plain-meaning interpretation and essentially ends the discussion. The ordinary meaning of the phrase 'report for work' is to actually, physically show up." The court noted, "The fundamental task in interpreting Wage Orders is ascertaining the drafters' intent, not drawing up interpretations that promote the Court's view of good policy." ( Ibid . )
*1193 Finally, Judge Wu observed that the retailer's "call-in scheduling policy is somewhat unfriendly to employees and disrespects their time." The court noted that policy "may make it harder to attract quality employees" and "result in high turnover." But, Judge Wu concluded, "the Wage Order's reporting-time provisions do not provide a remedy." ( Casas , supra , 2014 WL 12644922, at *6 & fn. 6.)
Judge Wu's opinion is thorough, well-reasoned, and sensible. I would follow it.
In addition to the "suitable transportation" language Judge Wu discusses, other legislative history supports the conclusion that, by "report[ing] for work," the wage order's drafters meant showing up in person. In 1943, the IWC enacted a reporting time pay provision for employees who "report for work." The IWC explicitly found the reason for paying reporting time premiums is to "compensate the employee for transportation costs and loss of time." (IWC meeting mins. (Apr. 5, 1943) ¶ 16, p. 34.) Other IWC actions from the early 1960s to the late 1970s were consistent with this intent. (See, e.g., Cal. Dept. of Industrial Relations, Div. of Industrial Welfare, Enforcement Manual (Oct. 1965) ¶ 418 (referring to Wage Order No. 14) [by enacting reporting time pay provision, IWC was attempting to "guarantee the worker some earnings for making the trip to the place of employment"].)
There is more, much more. The legislative history consumes some 18,000 pages. But discussions of legislative history can waterlog the most buoyant reader. Suffice it to say here that no objective reader can study this complete legislative history and disagree with Judge Wu.
Ward relies on a different unpublished federal case decided not quite three years later, Bernal v. Zumiez, Inc. (E.D.Cal., Aug. 17, 2017, No. 2:16-cv-01802-SB) 2017 WL 3585230 [nonpub. opn.] ( Zumiez ).[2] As did Casas , Zumiez seems to concern a version of types two and three of the on-call shifts at issue here. The plaintiffs in Zumiez alleged their employer required them "to call in prior to regularly scheduled *482 shifts three or four times a week" to find out if they had to come in to the store. ( Zumiez , supra , 2017 WL 3585230, at *1.) The court (United States District Judge Stanley A. Bastian) stated the issue as whether " 'report[ing] for work' means physically coming to the workplace" or, instead, "if telephonic reporting is sufficient for reporting time pay to inure." ( Id . at *2.) The court noted, "The case becomes a question *1194 of statutory interpretation: does the wage order require workers to physically come to the workplace in order to report?" ( Id . at *3.)
The Zumiez court "conclude[d] that a 'plain meaning' reading-one that applies a commonsense interpretation-supports the conclusion that telephonically calling in falls under the ambit of activity enforceable by the wage order." The court stated, "This legislative phrase [report for work] is facially unambiguous, and does not require a dictionary for interpretation." The court also found "no need for the Court to engage with the legislative history of the wage order." ( Zumiez , supra , 2017 WL 3585230, at *3.) The Zumiez court said it "[took] notice of the order issued in [ Casas ]" ( id . at *1 ), but the court did not discuss Judge Wu's reasoning or conclusions. Respectfully, the Zumiez opinion is an ipse dixit. It is unpersuasive.
In a third unpublished federal case, Segal v. Aquent LLC (S.D.Cal., Sept. 24, 2018, No. 18cv346-LAB) 2018 WL 4599754 [nonpub. opn.] ( Segal ), a federal district court in San Diego agreed with Zumiez , but asked the parties to "keep the Court apprised of developments" in the Zumiez appeal before the Ninth Circuit. ( Segal , supra , 2018 WL 4599754, at *5 & fn. 3.) Segal was a putative class action against a Massachusetts "staffing" company, commonly known as a temp agency. Segal alleged Aquent hired individuals and "assign[ed] them out to companies looking to hire short-term workers." Segal alleged that Aquent's "recruiters misrepresented the number of hours [she] and her fellow employees would receive from their assigned companies" and that she "was required to 'report to work' [sic ] via daily teleconference, regardless of whether there was work or not." ( Id . at *1.) Like the Zumiez decision, the Segal opinion contains no analysis.
As this court has noted, in cases construing wage orders, "[o]ur task is to determine the Industrial Welfare Commission's intent in promulgating the reporting time pay regulation. The rules of statutory construction apply to the interpretation of regulations." ( Price v. Starbucks Corp. (2011) 192 Cal.App.4th 1136, 1145, 122 Cal.Rptr.3d 174 ( Price ).) In my view, Casas - not Zumiez -correctly determined what it means to "report for work." I respectfully disagree with the Zumiez court that the phrase "report for work" is "facially unambiguous." The Zumiez court saw "no need" to consider the legislative history of the wage order. As Judge Wu noted in Casas , that legislative history supports Tilly's interpretation of the wage order's language.
The Division of Labor Standards Enforcement (DLSE), a division of the Department of Industrial Relations, is responsible for enforcing wage orders promulgated by the IWC. ( *1195 Aguilar v. Association for Retarded Citizens (1991) 234 Cal.App.3d 21, 25, 285 Cal.Rptr. 515.) As recently as 2011, the DLSE stated that reporting time penalties are due only when "the employer finds it necessary to send the employee home because there is no work." (DLSE, Information Sheet: Wages et al. (Jan. 2011) < https://www.dir.ca.gov/dlse/Wages.pdf> [as of Feb. 4, 2019].) "While DLSE advice letters are not subject to the rulemaking procedures of the Administrative Procedure Act [citation], *483 and thus have less force than regulations, courts follow them when they are persuasive." ( Hernandez v. Pacific Bell Telephone Co . (2018) 29 Cal.App.5th 131, 143, 239 Cal.Rptr.3d 852, citing Morillion v. Royal Packing Co . (2000) 22 Cal.4th 575, 584, 94 Cal.Rptr.2d 3, 995 P.2d 139 ( Morillion ).)
Ward argues in her brief that the preposition "for" "is intended to convey purpose," in contrast with the preposition "to" which-Ward says-"is characterized by physical movement." Ward's counsel conceded at oral argument that, if the wage order used the phrase "report to work," that would "suggest" a "physical presence" requirement. But, counsel said (notwithstanding the concession in his brief), Ward had not "analyzed that specific term." At least one federal court has interpreted the phrase "report to work" to mean physically reporting. Culley v. Lincare Inc . (E.D.Cal. 2017) 236 F.Supp.3d 1184 ( Culley ) was a putative class action. Plaintiff Christina Culley was a "healthcare specialist." She worked eight-hour shifts and was "also expected to be on-call certain evenings and weekends to handle customer issues that cropped up outside regular business hours." ( Id . at p. 1187.) Lincare paid Culley for the time she actually worked on these after-hours customer issues, but Culley contended she was entitled to a full two hours' reporting time pay. Lincare contended Culley was entitled to this reporting time pay only "when she was required to leave her house to perform after-hours work," not when she was able to "resolve the customer's issue over the telephone." ( Id . at p. 1189.)
The court concluded that, even though "the relevant regulations are to be construed liberally in favor of the employee," Lincare "ha[d] the better of the argument." The court said, "While [Culley] continually emphasizes the regulation's applicability to when an employee is required to 'work,' she wholly ignores the requirement that the employee report to work." ( Culley , supra , 236 F.Supp.3d at p. 1190, original emphasis.) The court held that the reporting time pay requirement "applies only to occasions when [Culley] and class members were required to physically report to work and not to when they performed work via telephone." ( Ibid . )
Tens of millions of dollars in potential employer liability should not turn on the difference between the prepositions "to" and "for." Indeed, leading treatises treat the two words as interchangeable. (See, e.g., Simmons, Wage *1196 and Hour Manual for Cal. Employers (21st ed. 2018) §§ 7.15, pp. 272-273, 8.13(b)(4), pp. 358-359 [using the terms "reporting-time pay," "reporting pay," and "show-up pay" as interchangeable; "[u]nder ... the reporting-time pay requirements of the California Wage Orders, an employee may be paid a minimum of a specified number of hours' pay ... when, after reporting to work at his scheduled starting time ... he is not provided with the expected amount of work"]; 1 Wilcox, Cal. Employment Law (2018) Overview of Wage and Hour Laws, § 1.05[2][e], pp. 1-53-1-54 (Wilcox) [IWC wage orders cover a number of "facets of employment," including "[r]eporting time pay (minimum wages payable to employee who reports to work as required, but is not put to work or is furnished less than half the usual or scheduled day's work)"]; Advising Cal. Employers and Employees (Cont.Ed.Bar 2018) Wage and Hour Laws, § 5.15, p. 5-32 (CEB Advising California Employers) [reciting rule if employee "is required to report for work and does report" under heading "Pay for Reporting to Work"].)
Ward argues that even if, by "report for work," the IWC meant "physical attendance in the 1940s," we should redefine and *484 expand that term because of "technological innovation." That "technological innovation," Ward says, is the cellular telephone. But there has been no technological change pertinent to proper statutory interpretation in this case. Nothing turns on whether a cord or a cell tower connects the phone. The notion that phones were unfamiliar in the 1940s is a historical: spend some enjoyable time listening to Glenn Miller's 1940 hit PEnnsylvania 6-5000. (The Andrews Sisters' rendition is delightful.)[3] When the Legislature defunded the IWC effective July 1, 2004,[4] cellular or mobile phones had been in use for some time.[5]
It is undoubtedly true-as Judge Wu noted-that the uncertainty of not knowing whether an employee will have to work an on-call shift can constitute a significant hardship to that employee. I also assume employers like Tilly's have legitimate business reasons for needing the flexibility to schedule employees based on unexpected surges or lulls in customers, absences of other employees due to illness or family emergencies, and the like. It would be surprising if retailers maintain on-call policies just to torture employees. Balancing these competing needs and interests of employers and employees is a task for the Legislature, not this court. The Legislature can *1197 give notice to all interested parties, learn the social costs and benefits of various alternatives, and engineer compromises acceptable to all. We cannot.
Indeed, our Legislature considered predictive scheduling legislation as recently as 2016. In 2015 and 2016, the California Assembly took up the proposed "Fair Scheduling Act of 2015," Assembly Bill No. 357 (AB 357). AB 357 would have provided for certain calculations of pay depending on how much notice the employer gave the employee. (Assem. Bill No. 357 (2015-2016 Reg. Sess.) § 3(c)(1)-(3).) The California Senate considered a similar bill, Senate Bill No. 878 (SB 878), the proposed "Reliable Scheduling Act of 2016." Like AB 357, SB 878 would have calculated the amount of pay required based on the amount of notice the employer gave the employee. (Sen. Bill No. 878 (2015-2016 Reg. Sess.) § 1(e)(1)-(2).)
In 2014, the San Francisco Board of Supervisors enacted an ordinance entitled, "Predictable Scheduling and Fair Treatment for Formula Retail Employees Ordinance." (San Francisco Ordinance No. 241-14.) The ordinance applies to businesses that employ 20 or more individuals in the city of San Francisco and "have at least 20 retail establishments located worldwide." (Id ., § 3300G.1.) The ordinance requires employers to post work schedules at least two weeks in advance. (Id ., § 3300G.4, subd. (b).) An employer must pay an employee one hour of pay if it changes the schedule 24 hours or more but fewer than seven days in advance. (Id ., § 3300G.4, subd. (c)(2)(A).) The ordinance also provides for payments of two or four hours for changes or cancellations to scheduled or on-call shifts depending on the amount of notice and the shift's length. (Id ., § 3300G.4, subd. (c)(1)(B), (C).) The ordinance contains a number of exceptions, including the unexpected unavailability of *485 another employee when the employer did not receive at least seven days' notice, the failure of another scheduled employee to show up, employees' trading of shifts, and mandatory overtime. (Id ., § 3300G.4, subd. (e).)
How are we-an appellate court limited to the narrow record before us-to determine how much notice is enough to avoid a violation of the wage order? What if employees are required to call in eight hours in advance instead of two? How about 12 hours? Twenty-four? Three days? A week? At oral argument, Ward's counsel seemed to offer a concession that a requirement employees call in 24 hours in advance would be legal. But a concession by one attorney in one case cannot bind all of the plaintiffs' lawyers across the state who might choose to file similar lawsuits.
And what about a situation in which an on-call employee is needed to come in to the store because another employee called in sick, or has a family *1198 emergency, or just didn't show up? Does the rule we announce today apply to all retailers in our state of 40 million people, regardless of how many employees or locations it has? Does it apply to almost every other industry in our state? Fifteen of California's 18 wage orders[6] -governing everything from manufacturing to transportation to "amusement and recreation" to "handling products after harvest"-contain the identical phrase: to report for work.
The conclusion that the legislative intent of those who wrote Wage Order No. 7-2001 was not to require payment to employees who are required merely to call their employer to learn whether they must "report for work" should-to quote Judge Wu-end the discussion. As a court, our fundamental task in interpreting this wage order "is ascertaining the drafters' intent, not drawing up interpretations that promote the Court's view of good policy." ( Casas , supra , 2014 WL 12644922, at *5.) Any needed fix is the responsibility of our Legislature.
C. On-call Shifts for Which the Employee Physically Reports in Person But Is Sent Home After Her Regular Four-hour Shift
Type one of the on-call shifts alleged in this case requires a different analysis. As noted, in that version of Tilly's practice, "[e]mployees are scheduled for a regular shift as well as an on-call shift later that same day. In such instances the employee is required to physically show up for work at the time of her regular shift and is told during her regular shift whether she will also be required to work her on-call shift." Ward seeks to sue on behalf of a subclass of employees "who: (a) were scheduled for a regular shift immediately followed by an on-call shift that same day; (b) physically reported to work by working their regular shift; and (c) were not paid the greater of two hours at their regular rate of pay and one-half of their scheduled day's work at their regular rate of pay."
So according to the allegations of Ward's first amended complaint, she did physically report to work but was sent home after her regular shift, and not permitted to work her two-hour add-on shift, without any compensation. The trial court's order sustaining Tilly's demurrer did not discuss this version of the on-call policy. Tilly's counsel-who drafted the proposed order for the court's review-included several paragraphs regarding the on-call-shift-following-scheduled-shift type of arrangement, *486 but the trial court marked them out. The trial court's conclusion-"by merely calling in to learn whether an employee will work a call-in shift, Plaintiff and other employees *1199 do not report to [sic ] work as contemplated by Wage Order 7[-2001]"-by its terms does not cover type one of Tilly's on-call practice.
On appeal, Tilly's never explains why this practice is not unlawful under the wage order as a situation in which the employee "is required to report for work and does report, but is not put to work ...." Under most or all of the IWC's wage orders, "if an employee is required to report for work a second time on any one workday and is furnished less than two hours of work on the second reporting, the employee shall be paid for two hours at the employee's regular rate of pay." (Wilcox, supra , Overtime and Regulation, § 3.01[5][b], pp. 3-20-3-21.) Ward alleges she did show up, in person, prepared to work an add-on shift at the conclusion of her scheduled shift, but was sent home and not permitted to work the add-on shift.
All that Tilly's has to say on this subject appears at page 45 of its brief: "Under existing California law, employers are and always have been free to extend employees' shifts before they end." Tilly's cites no authority for this assertion. When asked about this at oral argument, Tilly's counsel said only that employers have "every right without any notice" to require employees to stay for additional hours after the end of their shifts, and that there is no statute or regulation prohibiting them from doing so. But there is a difference between an employer occasionally extending an employee's workday so that she must continue to work past the time her shift is scheduled to end, and a routine practice of requiring employees to work 50 percent more time-two hours added on to a four-hour shift-with at most a few hours' notice.
D. Retroactivity
Finally, in any event, our interpretation of the wage order's "report for work" language should be prospective only. Both Ward and Tilly's insist the language of the wage order is absolutely clear. But their readings of this "absolutely clear" language are 180 degrees apart. Two federal judges have read the same three words to mean opposite things. Wage Order No. 7-2001 has been on the books for more than 70 years. Neither the Division of Labor Standards Enforcement nor the Division of Industrial Welfare Enforcement ever has filed any charge or initiated any action against an employer for an "on-call" policy. The DLSE "is the state agency authorized to interpret and enforce California's labor laws." ( Price , supra , 192 Cal.App.4th at p. 1146, fn. 10, 122 Cal.Rptr.3d 174.) As noted, the DLSE's interpretation of the wage order has been in accord with Tilly's reading of the language: that "report for work" means actually showing up. "Although not binding on a court, the DLSE's construction is entitled to consideration and respect." ( Ibid . ; see also Morillion, supra, 22 Cal.4th at p. 584, 94 Cal.Rptr.2d 3, 995 P.2d 139.) None of the three leading treatises cited-all updated as of 2018-even mentions the issue. Until August of 2017, when a federal district court *1200 in Sacramento issued its unpublished opinion, no court ever had held such an "on-call" policy to be unlawful.
E. Conclusion
Proper public policy about on-call shifts is complex. Retailers face inevitable uncertainty: weather, traffic, inventory gluts and shortages, and marketing responses all affect the number of customers who may appear on a given day. Some efficient businesses *487 would like to staff with flexibility. This is less an issue of management competence than it is of grappling with market unpredictability.
The question is legislative. California is blessed with an active, informed, engaged, attentive legislature that is in session year-round. Our legislature can hold hearings to investigate the dimensions of this statewide situation. All interested parties can receive notice and an opportunity to be heard. Legislative compromises can be proposed, debated, adjusted, and revisited. This court can do none of that.
I would affirm the trial court's order sustaining Tilly's demurrer to Ward's first amended complaint except for the legal theory set forth in paragraph 25(a) of that complaint. I would have the parties bear their own respective costs on appeal.

Judge Wu sometimes quoted the wage order as using the phrase "report to work" rather than "report for work." The court focused more on the meanings of the words "report" and "to present oneself" than on any difference between the prepositions "for" and "to."

That case now is on appeal in the United States Court of Appeals for the Ninth Circuit, No. 18-15135, after the district court certified its order for interlocutory appeal. The original plaintiff, Alexandra Bernal, dropped out of the case and the lead plaintiff now is Alexia Herrera. For clarity, I refer to the case as Zumiez . Oral argument is scheduled for February 4, 2019.

The first automated dial exchanges in the Bell System were deployed in 1919. (Engber, Who Made That?: Dial Tone (Jan. 10, 2014) The New York Times Magazine < https://www.nytimes.com/2014/01/12/magazine/who-made-that-dial-tone.html> [as of Feb. 4, 2019] (Engber article).)

Bearden v. U.S. Borax, Inc . (2006) 138 Cal.App.4th 429, 434, fn. 2, 41 Cal.Rptr.3d 482.

As of 2003, according to the U.S. Census Bureau, 94 percent of U.S. households had landlines and 63 percent had cell phones. (Engber article, supra .)

Gerard v. Orange Coast Memorial Medical Center (2018) 6 Cal.5th 443, 448, 240 Cal.Rptr.3d 757, 430 P.3d 1226 ; CEB Advising California Employers, supra , § 5.3, pp. 5-8-5-9.