# IN THE SUPREME COURT OF CALIFORNIA

GEORGE HUERTA,
Plaintiff and Appellant,

v.

CSI ELECTRICAL CONTRACTORS,
Defendant and Respondent.

S275431

Ninth Circuit
21-16201

Northern District of California
5:18-cv-06761-BLF

March 25, 2024

Justice Liu authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Kruger, Groban, Jenkins, and Evans concurred.

HUERTA v. CSI ELECTRICAL CONTRACTORS

S275431

Opinion of the Court by Liu, J.

Industrial Welfare Commission (IWC) wage order No. 16-2001 (Wage Order No. 16) governs wages, hours, and working conditions in the construction, drilling, logging, and mining industries. (Cal. Code Regs., tit. 8, § 11160.) It entitles certain employees in these industries to at least minimum wage compensation for "hours worked." (*Id.*, § 11160, subd. 4(B); see *id.*, § 11160, subd. 2(J).)

We granted a request from the United States Court of Appeals for the Ninth Circuit to answer three questions about Wage Order No. 16 and the scope of the term "hours worked." First: "Is time spent on an employer's premises in a personal vehicle and waiting to scan an identification badge, have security guards peer into the vehicle, and then exit a Security Gate compensable as 'hours worked' within the meaning of . . . Wage Order No. 16?" (*Huerta v. CSI Electrical Contractors, Inc.* (9th Cir. 2022) 39 F.4th 1176, 1177 (*Huerta*).) Second: "Is time spent on the employer's premises in a personal vehicle, driving between the Security Gate and the employee parking lots, while subject to certain rules from the employer, compensable as 'hours worked' or as 'employer-mandated travel' within the meaning of . . . Wage Order No. 16?" (*Ibid.*) And third: "Is time spent on the employer's premises, when workers are prohibited from leaving but not required to engage in employer-mandated activities, compensable as 'hours worked' within the meaning of . . . Wage Order No. 16, or under California Labor Code Section

1

1194, when that time was designated as an unpaid 'meal period' under a qualifying collective bargaining agreement?" (*Ibid*.)

We answer these questions as follows: First, an employee's time spent on an employer's premises awaiting and undergoing an employer-mandated exit procedure that includes the employer's visual inspection of the employee's personal vehicle is compensable as "hours worked" within the meaning of Wage Order No. 16, section 2(J).

Second, the time that an employee spends traveling between the Security Gate and the employee parking lots is compensable as "employer-mandated travel" under Wage Order No. 16, section 5(A) if the Security Gate was the first location where the employee's presence was required for an employment-related reason other than the practical necessity of accessing the worksite. Separately, this travel time is not compensable as "hours worked" because an employer's imposition of ordinary workplace rules on employees during their drive to the worksite in a personal vehicle does not create the requisite level of employer control.

Third, when an employee is covered by a collective bargaining agreement that complies with Labor Code section 512, subdivision (e) and Wage Order No. 16, section 10(E), and provides the employee with an "unpaid meal period," that time is nonetheless compensable under the wage order as "hours worked" if the employer prohibits the employee from leaving the employer's premises or a designated area during the meal period and if this prohibition prevents the employee from engaging in otherwise feasible personal activities. An employee may bring an action under Labor Code section 1194 to enforce the wage order and recover unpaid wages for that time.

**I.**

The California Flats Solar Project (the Site) is a solar power facility located on privately owned land in Monterey and San Luis Obispo Counties. First Solar Electric, Inc. (First Solar) owns the facility. A subcontractor hired George Huerta (Huerta) and other workers to assist CSI Electrical Contractors (CSI), the company providing "procurement, installation, construction, and testing services" at the Site.

A designated road provided access between a guard shack located at the Site's perimeter and the employee parking lots. A security gate (Security Gate) was located on that road several miles from the guard shack; from the Security Gate, it would take Huerta approximately 10 to 15 minutes to reach the parking lots. Huerta underwent security checks at the Security Gate and was told by CSI management that this gate was the "first place" he had to be at the beginning of the workday.

In the morning, vehicles formed a long line outside the Security Gate, where guards scanned each worker's badge and sometimes peered inside vehicles and truck beds. At the end of the day, workers again formed a long line inside the Security Gate, where the exit procedure took place. The exit procedure could take up to a minute or more per vehicle and caused delays of five to over 30 minutes. CSI told Huerta that security guards had the right to search vehicles during the entry and exit processes, and the guards visually inspected the bed of his truck for stolen tools or endangered species. Huerta was not paid for the time he spent waiting to pass through the Security Gate at the beginning or end of the workday.

Because two endangered species were present near the Site, the Department of Fish and Wildlife required First Solar

to obtain an Incidental Take Permit (ITP) before work could begin on the project. The ITP imposed a speed limit of 20 miles per hour on the access road between the guard shack and the parking lots, and restricted the roads that could be taken at the Site. It also required a biologist to monitor the Site to minimize disturbances to species' habitats. As part of this monitoring, the biologist each morning ensured that the road between the guard shack and the parking lots was clear of endangered species before anyone could enter the Site. On some occasions, this clearing process added to the time Huerta spent waiting in line to enter the worksite in the morning.

As First Solar's subcontractor, CSI was required to abide by the ITP and was required to ensure that its employees did as well. After passing through the Security Gate each morning, Huerta was subject to the rules imposed by the ITP in addition to other rules governing his conduct. CSI required adherence to speed limits between five and 20 miles per hour; restricted travel to driving on the access road to reach the Site, thereby prohibiting employees from driving on other roads near the Site or walking or biking from the Security Gate to the parking lots; and prohibited employees from honking their horns, playing music that could be heard outside of their vehicles, or otherwise disturbing local wildlife. Violation of these rules or other Site rules could result in suspension or termination. Huerta was not paid for the time he spent driving between the Security Gate and the employee parking lots.

Huerta's employment was governed by two collective bargaining agreements (CBAs), which specified that the standard workday included an unpaid 30-minute meal period. CSI did not allow workers to leave the Site during the workday and instructed workers to spend their meal periods at a

designated area near their assigned worksite (Installation Site). In accordance with the CBAs, Huerta was not paid for his meal periods.

Huerta filed a wage and hour class action in the Superior Court of Monterey County on behalf of himself and all others similarly situated against CSI, seeking payment for unpaid hours worked. The suit was removed to the United States District Court for the Northern District of California. The district court granted Huerta's motion for class certification. CSI then filed a motion for partial summary judgment on the class claims Huerta raised in his first amended complaint; that motion was granted by the district court. CSI filed a second motion for partial summary judgment on the class claim that survived the first motion for partial summary judgment. This second motion was also granted. Huerta timely appealed the orders granting CSI's motions to the Ninth Circuit, which certified to us the questions stated above.

## II.

"The [IWC] was established more than a century ago 'to fix minimum wages, maximum hours of work, and standard conditions of labor.'" (*Frlekin v. Apple Inc.* (2020) 8 Cal.5th 1038, 1045 (*Frlekin*).) To achieve this goal, the IWC formulated a series of regulations known as wage orders. (See *Hernandez v. Pacific Bell Telephone Co.* (2018) 29 Cal.App.5th 131, 136–137 (*Hernandez*).) These industry- and occupation-wide orders specify "minimum requirements with respect to wages, hours, and working conditions." (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1026 (*Brinker*).)

Wage Order No. 16 applies to employees like Huerta who work in certain "on-site occupations" in the construction,

drilling, logging, and mining industries. (Cal. Code Regs., tit. 8, § 11160, subd. 1.) Section 4 of Wage Order No. 16 sets a minimum wage at which employees will be compensated for "hours worked." (Cal. Code Regs., tit. 8, § 11160, subd. 4.) " 'Hours worked' " is defined in Wage Order No. 16, section 2(J) as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." (Cal. Code Regs., tit. 8, § 11160, subd. 2(J); see *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 581 (*Morillion*) ["All 15" of the wage orders in effect at the time "contain the same definition of 'hours worked' . . . , except for IWC wage order Nos. 4–89 and 5–89, which include additional language."].)

We have explained that the two clauses of the "hours worked" definition — the control clause and the suffered or permitted to work clause — "establish 'independent factors, each of which defines whether certain time spent is compensable as "hours worked." ' " (*Frlekin, supra,* 8 Cal.5th at p. 1046, quoting *Morillion, supra,* 22 Cal.4th at p. 582.) "Thus, an employee who is subject to the control of an employer does not have to be working during that time to be compensated under the applicable wage order. ([*Morillion,* at p. 582].) Likewise, an employee who is suffered or permitted to work does not have to be under the employer's control to be compensated, provided the employer has or should have knowledge of the employee's work." (*Frlekin,* at p. 1046, italics omitted.)

## A.

The Ninth Circuit asks whether time an employee spends on his employer's premises waiting in his personal vehicle to scan an identification badge and have a security guard peer into

his vehicle before exiting a Security Gate is compensable as "hours worked." We hold that it is.

In *Frlekin,* the Ninth Circuit asked us to resolve a similar question: whether time that Apple employees spent on Apple's premises "waiting for, and undergoing, required exit searches of packages, bags, or personal technology devices voluntarily brought to work purely for personal convenience by employees" is compensable as " 'hours worked.' " (*Frlekin, supra,* 8 Cal.5th at p. 1042.) In answering yes, we conducted a "strictly textual analysis" of the control clause, which led us to conclude that "Apple employees are clearly under Apple's control while awaiting, and during, the exit searches." (*Id.* at p. 1047; see *ibid.*, citing *Bono Enterprises, Inc. v. Bradshaw* (1995) 32 Cal.App.4th 968, 974–975 (*Bono*), disapproved on other grounds in *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 574.) Apple's control of its employees during the time they spent "awaiting, and during, the exit searches" was evidenced by Apple's requirement that "its employees . . . comply with the bag-search policy under threat of discipline, up to and including termination"; its confinement of employees to the premises while they waited to undergo an exit search; and its requirement that employees "perform specific and supervised tasks while awaiting and during the search," including "locating a manager or security guard and waiting for that person to become available, unzipping and opening all bags and packages, moving around items within a bag or package, removing any personal Apple technology devices for inspection, and providing a personal technology card for device verification." (*Frlekin*, at p. 1047.)

Apple argued that the exit searches were not compensable because Apple employees could avoid them "by choosing not to

bring a bag, package, or personal Apple technology device to work." (*Frlekin*, *supra*, 8 Cal.5th at p. 1049.) We rejected this argument along with Apple's contention that the employee's activity, to be compensable under the control clause, must be " 'required' and 'unavoidable.' " (*Id.* at p. 1048.) "Redefining the control clause to cover only unavoidably required employer-controlled activities would limit the scope of compensable activities, resulting in a narrow interpretation at odds with the wage order's fundamental purpose of protecting and benefitting employees." (*Ibid.*) We reaffirmed "that '[t]he level of the employer's control over its employees, rather than the mere fact that the employer requires the employees' activity, is determinative' concerning whether an activity is compensable under the 'hours worked' control clause." (*Id.* at p. 1056, quoting *Morillion*, *supra*, 22 Cal.4th at p. 587.) Nonetheless, an activity's mandatory nature "remains probative in determining whether an employee is subject to the employer's control," along with other factors such as the location of the activity, the degree of the employer's control, whether the activity primarily benefits the employee or employer, and whether the activity is enforced through disciplinary measures. (*Frlekin*, at p. 1056.)

California courts have not addressed whether "time spent on the employer's premises, in a personal vehicle, waiting for and undergoing an exit process" that includes a vehicle inspection causing delay is compensable under the control clause. (*Huerta*, *supra*, 39 F.4th at p. 1180.) This case, like *Frlekin*, involves time spent on the employer's premises by employees awaiting an exit security procedure that included a search. The fact that an employee awaits and undergoes the exit process while in his personal vehicle does not necessarily transform that time into commuting time, nor does it foreclose

an employer's ability to exert control over its employee. An employee in his personal vehicle may be subject to his employer's control within the meaning of the wage order if sufficient indicia of control are present. The inquiry we undertook in *Frlekin* applies equally here.

We conclude that under the indicia of employer control identified in *Frlekin*, Huerta was subject to CSI's control "while awaiting, and during," the exit security procedure even though he was in his personal vehicle during that time. (*Frlekin*, *supra*, 8 Cal.5th at p. 1047.) Like the employees in *Frlekin*, Huerta was required to wait for and undergo the exit security procedure before leaving the Site. Whereas the bag search in *Frlekin* was practically mandatory because employees could only avoid it by not bringing personal technology items to work, compliance with CSI's exit procedure was strictly required for every employee. (*Id.* at pp. 1054, 1056 [mandatory nature of activity is probative].) Further, like the employees in *Frlekin*, Huerta remained confined to the employer's premises until he completed the exit procedure; the procedure was thus an "*onsite* employer-controlled activit[y]." (*Id.* at p. 1056; see *id.* at p. 1051 [an employer's level of control is "greater in the context of an onsite search"]; *Mendiola v. CPS Security Solutions, Inc.* (2015) 60 Cal.4th 833, 840 (*Mendiola*) [" ' "[W]hen an employer directs, commands or restrains an employee from leaving the work place . . . and thus prevents the employee from using the time effectively for his or her own purposes, that employee remains subject to the employer's control." ' "].)

In addition, Huerta was required to perform "specific and supervised tasks" as part of the exit procedure: he had to drive his vehicle to the Security Gate, wait in his vehicle until it was his turn to undergo the security check, roll down his window and

present his security identification badge to the guard, and submit his vehicle to visual inspection and possible physical search. (*Frlekin, supra,* 8 Cal.5th, at p. 1047; see *id.* at p. 1051 [describing the "specific actions and movements" required of employees to comply with Apple's bag search policy].) Finally, CSI's requirement that Huerta undergo the exit procedure was primarily in service of its own interests. (See *Frlekin, supra,* 8 Cal.5th at pp. 1052–1053.) CSI was bound by its contract with First Solar to comply with various health, safety, and environmental protection protocols, and it took an active role in enforcing those protocols, including through the exit procedure. In addition to ensuring that only badged workers entered and exited the Site each day, CSI also had an interest in preventing the theft of tools and endangered species from the premises. CSI therefore had a significant interest in ensuring compliance with its exit procedure.

CSI contends that unlike the security search in *Frlekin,* the exit procedure here is "strictly for the purposes of ingress and egress." The procedure, CSI says, is akin to "stopping at a gate at a parking garage to exit, which also requires the mere lowering of the window, reaching out of an arm, and scanning a card in order to cause the gate to rise," "swiping a card or using a key to unlock a door to exit the employer's building," or "flashing an identification card to bypass a security line."

This description does not capture the scope of the exit procedure or CSI's interest in it. As detailed in the Site's security plan, the procedure not only requires employees to present their badges for inspection and scanning; it also involves inspection of "back seats, back of trucks, and periodically . . . trunks of cars" by a security guard. The procedure requires the employment of personnel specifically tasked with "consistently

inspect[ing] any vehicle that has entered the project site upon exiting" to match the badge or badges presented by the driver to the individual or individuals in the vehicle and to check for stolen items or endangered species. The fact that security workers were employed to operate the Security Gate and conduct inspections — in lieu of security cameras or an automated gate that would open after "the mere lowering of the window, reaching out of an arm, and scanning a card" — is evidence that the exit process involved more than facilitation of ingress and egress.

To be sure, the CSI exit protocol is not as intrusive as the search in *Frlekin*. But the fact that the procedure itself could take up to a minute or more per vehicle suggests that CSI's inspections extended beyond the time necessary to simply scan a badge. It is also evidence that the procedure prolonged the time required for workers to exit the Site beyond what would result from ordinary traffic congestion at the end of the workday. We note that California's wage and hour statutes do not incorporate the federal *de minimis* doctrine and do not "excuse the payment of wages for small amounts of otherwise compensable time upon a showing that the bits of time are administratively difficult to record." (*Troester v. Starbucks Corp.* (2018) 5 Cal.5th 829, 835; *id.* at p. 847 ["a few extra minutes of work each day can add up"].)

We thus hold that when an employee spends time on his employer's premises awaiting and undergoing an exit security procedure that includes a vehicle inspection causing delay and that is mandated by the employer for its own benefit, the employee — even when in his personal vehicle — is subject to the employer's control, and the time is compensable as "hours worked" within the meaning of Wage Order No. 16.

## B.

Next: "Is time spent on the employer's premises in a personal vehicle, driving between the Security Gate and the employee parking lots, while subject to certain rules from the employer, compensable as 'hours worked' or as 'employer-mandated travel' . . . ?" (*Huerta*, *supra*, 39 F.4th at p. 1177.) We hold that the time may be compensable as "employer-mandated travel" but is not compensable as "hours worked."

## 1.

In determining whether this drive time is compensable as "employer-mandated travel" under Wage Order No. 16, section 5(A), we apply "the usual rules of statutory interpretation." (*Brinker*, *supra*, 53 Cal.4th at p. 1027.) Because IWC wage orders, like the provisions of the Labor Code, " 'have long been viewed as part of the remedial worker protection framework' " (*Brinker*, at p. 1027), we interpret these orders "so as to promote employee protection" (*Mendiola*, *supra*, 60 Cal.4th at p. 840; see *Brinker*, at pp. 1026–1027) and to benefit employees (see *Frlekin*, *supra*, 8 Cal.5th at p. 1045).

Wage Order No. 16, section 5(A) says: "All employer-mandated travel that occurs after the first location where the employee's presence is required by the employer shall be compensated at the employee's regular rate of pay or, if applicable, the premium rate . . . ." (Cal. Code Regs., tit. 8, § 11160, subd. 5(A).) Huerta urges a literal construction of the phrase "the first location where the employee's presence is required" and contends that because CSI management told him that the Security Gate was the "first place" he had to be at the beginning of the workday, his drive from the Security Gate to the employee parking lots is compensable as "employer-

mandated travel." Huerta also relies on declarations from other employees on this point.

In response, CSI contends that a location does not qualify as "the first location where the employee's presence is required by the employer" within the meaning of the wage order "just because an employer's premises can be accessed only from one point, and the employee is 'required' to stop there before starting work." If this were the case, CSI argues, employees would be entitled to compensation under Wage Order No. 16, section 5(A) for any travel occurring after passing through "any gate, front door, or other entrance." CSI urges us to interpret the phrase to refer to "the very common situation where employees must gather at a certain location, and then are required to travel again to another location."

As the Ninth Circuit explained, "[i]t is true that there was at least a de facto required arrival time to be at the [Security] Gate for entry and exit: Workers had to sign in at the parking lots before their shift started; there was a strictly enforced speed limit on the only road between the Gate and parking lot; CSI knew how long the drive took; the Gate did not open until a certain time each morning; and CSI 'gave workers a scheduled time when [they] could enter' the site, which sometimes was delayed; which taken together indicates CSI and the workers knew the Gate arrival time was de facto required for workers to begin or end their shifts on time. [¶] But de facto arrival times do not always signify that the drive was employer-mandated, compensable travel. Standard commutes need not be compensated in California, . . . during which there are always de facto required arrival times for locations unrelated to the employer." (*Huerta*, *supra*, 39 F.4th at p. 1184, citation omitted.)

The Statement as to the Basis for Wage Order No. 16 explains that section 5(A) was adopted with "compromise language proposed by employee and employer representatives." (IWC, Statement as to the Basis for Wage Order No. 16 Regarding Certain On-site Occupations in the Construction, Drilling, Mining, and Logging Industries (Jan. 2001) p. 10 (Statement as to the Basis for Wage Order No. 16).) In describing section 5(A), the statement reproduces the section's text and then cites *Morillion*. (Statement as to the Basis for Wage Order No. 16, *supra*, at p. 10.) In *Morillion*, we considered whether time spent by agricultural employees traveling to and from the worksite on employer-provided buses was compensable as "hours worked." (*Morillion*, *supra*, 22 Cal.4th at p. 578.) The employees were required to meet at a designated departure point at a certain time to catch a bus to the fields where they worked. (*Id.* at p. 579.) They sought compensation for time "(1) assembling at the [bus's] departure points; (2) riding the bus to the fields; (3) waiting for the bus at the end of the day; and (4) riding the bus back to the departure points." (*Ibid.*) We referred to this as "compulsory travel time," meaning time spent traveling "to and from a work site that an employer controls and requires." (*Id.* at p. 579 & fn. 2.) We concluded that this compulsory travel time was compensable as "hours worked" under the control clause because the employer " ' "direct[ed]" ' and ' " command[ed]" ' " the plaintiffs to "travel between the designated departure points and the fields" on the employer's buses. (*Id.* at p. 587.) We distinguished such travel time from "an ordinary commute from home to work and back that employees take on their own," which is not compensable. (*Id.* at p. 580, fn. 2.)

*Morillion* did not assess whether the employees' time was compensable as "employer-mandated travel," a term unique to Wage Order No. 16. And in adopting Wage Order No. 16, section 5(A), the IWC did not tether the term "employer-mandated travel" to the employer's control over that employee during the travel time, as it did for the term "hours worked." (Cal. Code Regs., tit. 8, § 11160, subd. 2(J).) Rather, the IWC elected to make compensation for "employer-mandated travel" turn on whether the employer mandates travel to a second location "after the first location where the employee's presence is required." (*Id.*, § 11160, subd. 5(A).)

We reject CSI's interpretation of "first location" as unduly restrictive. Although the IWC Statement as to the Basis for Wage Order No. 16 cites *Morillion*, there is no indication that the IWC intended to limit the applicability of Wage Order No. 16, section 5(A) to a scenario where employees are required to gather before traveling elsewhere. In addition, for time to be compensable as "employer-mandated travel," an employee need not be subject to the employer's control during the travel. The travel need only have occurred at the direction and command of the employer after the employee's arrival at the "first location" where the employer required the employee's presence. This much is clear from the text of section 5(A).

At the same time, we agree with CSI that a location does not qualify as "the first location where the employee's presence is required by the employer" within the meaning of the wage order "just because an employer's premises can be accessed only from one point, and the employee is 'required' to stop there before starting work." In circumstances where an employee must use a single entrance to the employer's premises, it could be said that the employee's "presence" is, as a matter of practical

necessity, "required by the employer" at that entrance before entering work. (Cal. Code Regs., tit. 8, § 11160, subd. 5(A).) But this literalism does not align with the notion of being required by the employer — purposefully, not just circumstantially — to report to a specific location before subsequent employer-mandated travel. What the Ninth Circuit called "de facto arrival times" (*Huerta, supra,* 39 F.4th at p. 1184) do not demarcate "the first location where the employee's presence is required by the employer" under Wage Order No. 16, section 5(A). Were it otherwise, our reading of the wage order would be at odds with the rule that ordinary commuting, for which "there are always de facto required arrival times for locations unrelated to the employer" (*Huerta,* at p. 1184), "is not generally compensable" (*Frlekin, supra,* 8 Cal.5th at p. 1051).

We hold that an employee's presence at a location is "required by the employer" within the meaning of the wage order when it is required for an employment-related reason other than the practical necessity of reaching the worksite. Examples include situations where an employee's presence at an initial location is required to pick up work supplies, receive work orders or other directives, or perform work before traveling to a second jobsite. (See *Griffin v. Sachs Electric Co.* (N.D.Cal. 2019) 390 F.Supp.3d 1070, 1097, affd. mem. (9th Cir. 2020) 831 Fed.Appx. 270 [citing *Burnside v. Kiewit Pacific Corp.* (9th Cir. 2007) 491 F.3d 1053, 1056, 1070, and reasoning that requiring an employee to be present at a designated site to receive instructions and retrieve equipment are "indicative" of employer requirements that would render travel time compensable under Wage Order No. 16, § 5(A)].)

This reading is supported by material presented to the IWC during the public hearings that informed the adoption of

Wage Order No. 16. (See *Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1109–1110 [favorably discussing reliance on IWC hearing statements].) A representative of the State Building and Construction Trades Council explained that compensating employees for "employer-mandated travel" as provided in Wage Order No. 16, section 5(A) is "extremely important in the construction industry" because employees may be told to report to work at a particular job site, work at that site for a few hours, and then be asked to report to a second job site. (IWC public hg. transcript (Aug. 17, 2000) <https://www.dir.ca.gov/IWC/Pubmtg08172000.htm> [as of March 25, 2024]; this citation is archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.) Such a scenario more closely resembles the circumstances in *Morillion*, where the employees were required to arrive at designated departure points at certain times to travel to their worksites, than the "de facto arrival times" (*Huerta*, *supra*, 39 F.4th at p. 1184) that arise when employees out of practical necessity must arrive at certain locations in order to reach their worksite. Nothing in the IWC's public hearings suggests that section 5(A) was intended to apply to the latter scenario.

On the record before us, we express no view on whether the Security Gate was "the first location" where Huerta's presence was required by CSI such that his travel time between the Security Gate and the employee parking lots is compensable. On one hand, declarations by Huerta and other employees indicate that CSI told them the Security Gate was "the first place" they had to be at the beginning of the workday. It appears undisputed that workers were not allowed to enter the access road between the Security Gate and the employee parking lots until a biologist cleared the road each day and security guards

scanned their identification badges, which Huerta says caused five- to 20-minute delays entering the Security Gate in the morning. This could support the view that CSI required employees' presence at the Security Gate for a purpose other than accessing the worksite, i.e., ensuring compliance with CSI's security and environmental protection protocols. On the other hand, CSI offered evidence contradicting these allegations, including declarations from workers stating that CSI did not instruct them that the Security Gate was the first location that their presence was required and that they never observed delays in the morning. CSI also observes, and it appears undisputed, that passage through the Security Gate is practically necessary in order to reach the employee parking lots; there is no other access road.

In sum, for travel time to be compensable under Wage Order No. 16, section 5(A), there must be evidence not only that the employer required the employee's presence at an initial location before mandating travel to a subsequent location, but also that the employee's presence was required for an employment-related reason other than accessing the worksite. An employee's declaration that the employer required him to be present at an entrance gate to access the worksite is insufficient by itself to meet this standard. Here, whether the Security Gate is "the first location" within the meaning of the wage order turns on whether Huerta's presence there was required by CSI for an employment-related reason other than the practical necessity of accessing the worksite, as well as the nature of any such reason. Relevant considerations include, but are not limited to, what purpose is served by the employee's presence at the location, what activities occur there, and how much time is spent there.

**2.**

We next consider "whether driving on an employer's premises, in a personal vehicle, before or after a shift, while subjected to an employer's rules, is compensable as 'hours worked' " (*Huerta, supra,* 39 F.4th at p. 1183), first under the control clause and then under the suffer or permit to work clause (Cal. Code Regs., tit. 8, § 11160, subd. 2(J)).

CSI relies on the high court's interpretation of the Fair Labor Standards Act of 1938 (FLSA) (29 U.S.C. § 201 et seq.) in *Anderson v. Mt. Clemens Pottery Co.* (1946) 328 U.S. 680 and on the Portal-to-Portal Act of 1947 (29 U.S.C. § 251 et seq.) to argue that time spent traveling on an employer's premises before or after work is not generally compensable. Congress passed the FLSA in 1938. (Pub.L. No. 75-718 (June 25, 1938) 52 Stat. 1060; see also 29 U.S.C. § 201 et seq.) Among other provisions, the act set a federal minimum wage and rules for overtime compensation, but it did not define the statutory terms "work" or "workweek." (See 29 U.S.C. §§ 203 [definitions], 206 [minimum wage], 207 [maximum hours].) In its early cases interpreting the act, the high court construed those terms broadly. It defined "work" to mean "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." (*Tennessee Coal Co. v. Muscoda Local* (1944) 321 U.S. 590, 598.) And it defined "workweek" to include "all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace, the time spent in these activities must be accorded appropriate compensation." (*Anderson, supra,* 328 U.S. at pp. 690–691.) "Applying these expansive definitions, the Court found compensable the time spent traveling between

mine portals and underground work areas, *Tennessee Coal*, [*supra*, 321 U.S. at p. 598], and the time spent walking from timeclocks to workbenches, *Anderson*, [*supra*, 328 U.S. at pp. 691–692]." (*Integrity Staffing Solutions, Inc. v. Busk* (2014) 574 U.S. 27, 31 (*Integrity Staffing*).)

These decisions "provoked a flood of litigation" (*Integrity Staffing*, *supra*, 574 U.S. at p. 31; *id.* at pp. 32–33) and led Congress to pass the Portal-to-Portal Act of 1947, which amended the FLSA.  (Pub.L. No. 80-49 (May 14, 1947) 61 Stat. 84; see also 29 U.S.C. § 254.)  As relevant here, the act exempted employers from liability for wage claims based on " '(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and [¶] (2) activities which are preliminary to or postliminary to said principal activity or activities . . . .' " (*Integrity Staffing*, at p. 32.)

"In response [to the Portal-to-Portal Act], the IWC, exercising its authority to provide employees with greater protection than federal law affords [citations], revised its wage orders from 1947 forward . . . ." (*Martinez v. Combs* (2010) 49 Cal.4th 35, 60 (*Martinez*).)  Before this revision, "California's definition of 'hours worked' was entitled 'Hours Employed' in most wage orders and was defined differently."  (*Morillion*, *supra*, 22 Cal.4th at p. 591.)  "For example, former IWC wage order No. 1 N.S. provided as follows:  ' "Hours Employed" means all time during which: [¶] (1) An employee is *required to be on the employer's premises*, or to be on duty, or to be at a prescribed work place . . . ."  (*Id.* at p. 591, fn. 7, italics added.)  The 1947 revision adopted the term "hours worked" and defined it to mean " 'the time during which an employee is subject to the control of an employer, . . . includ[ing] all the time the employee is

suffered or permitted to work, whether or not required to do so.' " (*Martinez*, at p. 60, italics omitted.)

CSI contends that "California's removal of 'required to be on the employer's premises' from the definition of 'hours employed' just after *Anderson* and just after Congress [enacted the Portal-to-Portal Act] is substantial evidence that California, like Congress, also rejected *Anderson*'s holding that traveling on the employer's premises before and after work should be compensated." But we rejected a nearly identical argument in *Morillion*. There we considered the contention that "the 1947 amendment [to the wage orders], which eliminated specific language regarding waiting time and time when employees are required to be on their employer's premises and on duty (in addition to 'time when an employee is required or instructed to travel on the employer's business after the beginning and before the end of her work day'; [citation]), covered preliminary and postliminary activities, including travel time, which are not compensable under the Portal-to-Portal Act." (*Morillion*, *supra*, 22 Cal.4th at p. 591.) We declined to infer that "the IWC revised the definition of 'hours worked' to correspond to the federal standard" (*ibid.*), which "expressly eliminates substantial protections to employees" (*id.* at p. 592). "In addition to eliminating the cited language, the IWC added the phrase 'the time during which an employee is subject to the control of an employer' to the definition of 'hours worked.' 'Control' may encompass activities described by the eliminated language . . . ." (*Id.* at pp. 591–592.) We observed that this "departure from the federal authority is entirely consistent with the recognized principle that state law may provide employees greater protection than the FLSA." (*Id.* at p. 592.)

Yet we had no occasion in *Morillion*, which addressed "compulsory travel time" on an employer-provided bus (*Morillion*, *supra*, 22 Cal.4th at pp. 587–588), to consider what circumstances would make travel time on work premises in an employee's own vehicle compensable as "hours worked" under the control test. Huerta says he is entitled to compensation for the time he spent driving between the Security Gate and the employee parking lots because he was subject to many rules imposed by CSI during this time and mandatory entrance and exit security procedures on either end. (We have considered the exit security procedure separately in response to the first certified question. (*Ante*, at pp. 6–12.))

The general Site rules that Huerta says CSI imposed during his drive on the access road include safety and personal protective equipment rules; anti-discrimination and anti-harassment rules; environmental rules; alcohol and drug policies; rules related to being subject to searches for alcohol, drugs, and other things; and rules prohibiting smoking, practical jokes, horseplay, gambling, photography, and playing loud music. Additional "rules of the road" required Huerta to abide by signs posted on the access road, adhere to speed limits, and drive only on the road connecting the Security Gate and the parking lots. Other rules prohibited Huerta from passing other drivers on the access road, stopping on the access road except in emergencies, smoking or using ear buds or ear pods while driving, or driving in a manner that would generate dust or otherwise disturb the local wildlife. Violation of these rules could result in suspension or termination.

Although these rules curbed Huerta's freedom of action while traveling between the Security Gate and the parking lots, we hold that they do not amount to a level of control sufficient

to render the travel time compensable as "hours worked." The rules at issue are designed to ensure safe, lawful, and orderly conduct while traveling on the employer's premises. Such rules are necessary and appropriate in virtually every workplace. A warehouse employee who drives onto the employer's grounds may be subject to speed limits, parking rules, and restrictions on noise, smoking, littering, paths of travel, or other conduct. The same is true of employees of amusement parks, universities, hospitals, retail stores, and other businesses with sizable grounds. Huerta cites no authority for a rule that an employee is entitled to compensation whenever he is not permitted to drive wherever he wants, to go however fast as he wants, or to stop wherever he wants on the employer's premises.

In addition, the position Huerta urges does not appear limited to driving time. If the rules that apply during Huerta's drive satisfy the control test, then so would workplace rules that curb an employee's freedom while walking or otherwise traveling on the employer's premises to and from the employee's worksite at the beginning or end of the day. A maintenance worker who skateboards to his office building may be prohibited from skateboarding through the lobby to the elevator. A department store clerk may be prohibited from chewing gum or talking on her cell phone while walking through the store before or after her shift. And employees of all kinds are subject to prohibitions on workplace harassment and discrimination while on an employer's premises.

We are unable to discern any meaningful distinction between such rules and the workplace rules alleged by Huerta to constitute employer control here. CSI appears correct that Huerta's position "has no limiting principle" and would invite claims of unpaid wages from "any employee who uses a time

clock" because "[e]mployees always spend some amount of time navigating towards a time clock or their workspace before a shift and away from the same area after a shift, in their cars on employer property or walking across employer hallways or sidewalks." Because workplaces are regulated environments, adopting Huerta's position would mean that whenever an employee is traveling on an employer's premises, including before or after a work shift, the time is compensable as "hours worked." We are not aware of any authority that has construed employer control so expansively. Even though " '[c]ontrol' may encompass activities described by the eliminated language" covering preliminary and postliminary activities in pre-1947 wage orders (*Morillion*, *supra*, 22 Cal.4th at p. 592), we decline to reduce the control test to a categorical rule of compensability for any time that an employee spends traveling on work premises. Rules designed to ensure safe, lawful, and orderly conduct while traveling on an employer's premises, such as the general Site rules and the "rules of the road" at issue here, do not impose a level of control that renders the time compensable.

Huerta says *Morillion* dictates a contrary result. But the fact that the employer in *Morillion* required its employees to use its buses to reach the workplace and "prohibited employees from using their own transportation" (*Morillion*, *supra*, 22 Cal.4th at p. 579) was notable because "[i]n contrast to Royal's employees, employees who commute to work on their own decide when to leave, which route to take to work, and which mode of transportation to use. By commuting on their own, employees may choose and may be able to run errands before work and to leave from work early for personal appointments." (*Id.* at pp. 586–587; see *id.* at p. 586 ["[D]uring the bus ride plaintiffs could not drop off their children at school, stop for breakfast

before work, or run other errands requiring the use of a car."];
*Frlekin, supra*, 8 Cal.5th at p. 1051 ["Commuting is an activity
that employees ordinarily initiate on their own . . . ."].)

The issue here does not concern Huerta's commute to the
workplace; it is whether the rules that apply during Huerta's
drive *on the workplace premises* make the driving time
compensable.  Huerta argues the control test is met because
"while on the Access Road, [workers] could not use the time
effectively for their own personal purposes."  But quite apart
from CSI's rules, once Huerta drove onto the Site, he did not
have the same options for running errands, dropping off
children, or attending to personal appointments that we found
relevant for evaluating control in *Morillion*.  Huerta's inability
to use the drive time for his personal purposes is no different
from the inability of an employee with a 30-minute commute to
use the 30 minutes required for getting to and from work —
independent of whatever additional time for personal errands
might be appended to the 30-minute commute — for his or her
personal purposes.  (See *Frlekin, supra*, 8 Cal.5th at p. 1051
["Commuting . . . is not generally compensable."].)  And if the
general Site rules were sufficient to establish control, then the
control test would boil down to a categorical rule of
compensability for *any* time an employee spends on the
employer's premises, including the time it may take to find a
parking space at the start of the work day, to walk between a
parking lot and worksite at the beginning or end of the day, or
to wait for an elevator in a tall building.  Unlike the mandatory
bus ride to the worksite in *Morillion*, and unlike the exit security
procedure here (*ante*, at pp. 9–14) and in *Frlekin*, the rules that
apply during Huerta's drive between the Security Gate and the

employee parking lots do not impose a level of control that renders the driving time compensable as "hours worked."

Huerta alternatively contends that the time he spent driving between the Security Gate and the employee parking lots is compensable as "hours worked" because he was "suffered or permitted to work" during that time. (Cal. Code Regs., tit. 8, § 11160, subd. 2(J).) This phrase encompasses "time an employee is working but is not subject to an employer's control," such as "unauthorized overtime, which the employer has not requested or required," or when an employee " 'voluntarily continue[s] to work at the end of a shift.' " (*Morillion*, *supra*, 22 Cal.4th at p. 585.) Courts have explained that " 'the standard of "suffered or permitted to work" is met when an employee is engaged in certain tasks or exertion that a manager would recognize as work.' " (*Hernandez*, *supra*, 29 Cal.App.5th at p. 142, quoting *Taylor v. Cox Communs. Cal., LLC* (C.D.Cal. 2017) 283 F.Supp.3d 881, 890.) Huerta says the time he spent driving between the Security Gate and the employee parking lots required him to exert himself mentally and physically, i.e., "work" for the benefit of his employer. But this expansive construction does not align with the definition of "work" in this context as " 'tasks or exertion that a manager would recognize as work.' " (*Hernandez*, at p. 142.) Because an employee's drive on the access road is not a form of exertion that a manager would recognize as work on the Site, the drive time is not compensable under the suffer or permit clause.

## C.

We now consider whether "time spent on the employer's premises, when workers are prohibited from leaving but not required to engage in employer-mandated activities, [is]

compensable as 'hours worked' within the meaning of . . . Wage Order No. 16, or under California Labor Code Section 1194, when that time was designated as an unpaid 'meal period' under a qualifying collective bargaining agreement." (*Huerta, supra,* 39 F.4th at p. 1177.)

Labor Code section 512, subdivision (a) and Wage Order No. 16, section 10(A) require employers to provide their employees 30-minute meal periods, subject to certain limitations and exemptions. As relevant here, Labor Code section 512, subdivision (a) requires that employees working for periods of more than five hours per day receive a meal period of not less than 30 minutes, unless the employer and employee waive the meal period in certain limited circumstances. The subdivision does not apply to "employee[s] employed in a construction occupation" (Lab. Code, § 512, subd. (f)(1); see *id.*, § 512, subd. (g)(2) [defining "construction occupation"]) if "(1) [t]he employee is covered by a valid collective bargaining agreement" and "(2) [t]he valid collective bargaining agreement expressly provides for the wages, hours of work, and working conditions of employees, and expressly provides for meal periods for those employees, final and binding arbitration of disputes concerning application of its meal period provisions, premium wage rates for all overtime hours worked, and a regular hourly rate of pay of not less than 30 percent more than the state minimum wage rate" (*id.*, § 512, subd. (e)(1), (2)).

Wage Order No. 16, sections 10(A) and 10(B) generally mirror Labor Code section 512, subdivision (a). (See Cal. Code Regs., tit. 8, § 11160, subd. 10(A), (B).) Further, like Labor Code section 512, subdivision (e), Wage Order No. 16, section 10(E) provides that "Subsections A, B, and D of Section 10, Meal Periods, shall not apply to any employee covered by a valid

collective bargaining agreement if the agreement expressly provides for the wages, hours of work, and working conditions of the employees, and if the agreement provides premium wage rates for all overtime hours worked and a regular hourly rate of pay for those employees of not less than 30 percent more than the state minimum wage." Unlike the exemption to the meal period requirements in Labor Code section 512, subdivision (e), the exemption under Wage Order No. 16, section 10(E) does not require the requisite collective bargaining agreement to "expressly provide[] for meal periods for . . . employees, [or provide for] final and binding arbitration of disputes concerning application of its meal period provisions." (Lab. Code, § 512, subd. (e)(2).)

The parties do not contest the validity of the CBAs, nor do they dispute that the CBAs contain the requisite provisions to exempt CSI from the meal period requirements set out in Labor Code section 512, subdivision (a) and Wage Order No. 16, section 10(A). (See *Huerta, supra,* 39 F.4th at pp. 1185–1186 [concluding that the CBAs properly exempted CSI from meal period requirements].) They dispute whether a meal period, when provided, may be unpaid if the workers remain subject to the employer's control.

Huerta argues that because he was prohibited from leaving the Site and subject to CSI's control during his meal period, that time is compensable as "hours worked." CSI contends that Huerta is not entitled to compensation for unpaid meal periods because the CBAs also exempted CSI from compliance with Wage Order No. 16, section 10(D). (See Cal. Code Regs., tit. 8, § 11160, subd. 10(E).) Wage Order No. 16, section 10(D) provides: "Unless the employee is relieved of all duty during a thirty (30) minute meal period, the meal period

shall be considered an 'on duty' meal period and counted as time worked. An 'on duty' meal period shall be permitted only when the nature of the work prevents the employee from being relieved of all duty and when, by written agreement between the parties, an on-the-job paid meal period is agreed to and complies with Labor Code § 512." (Cal. Code Regs., tit. 8, § 11160, subd. 10(D).) CSI urges us to read the exemption from section 10(D)'s paid meal period requirement to mean that under a qualifying CBA, workers may be permitted to bargain away their right to a minimum wage for an on-duty meal period even though it is "time worked."

We reject CSI's proposed construction of the Wage Order No. 16, section 10(D) exemption. To read the wage order as authorizing employees and employers to bargain away employees' right to be paid for an on-duty meal period, i.e., "time worked," would run afoul of the well-established principle that the right to a minimum wage under Labor Code section 1194, subdivision (a) is unwaivable. (*Gutierrez v. Brand Energy Services of California, Inc.* (2020) 50 Cal.App.5th 786, 799–800 (*Gutierrez*).) Instead, we interpret Wage Order No. 16, section 10(D) and (E) to permit employees to bargain for a *voluntary* paid on-duty meal period. In other words, an exemption from section 10(D) permits workers to negotiate a contract for on-duty meal periods even when "the nature of the work" does *not* "prevent[] the employee from being relieved of all duty." (Cal. Code Regs., tit. 8, § 11160, subd. 10(D).) Here, neither party argues that the nature of Huerta's work was such that he could not be relieved of all duty.

This reading harmonizes Wage Order No. 16, section 10(D) and (E) with Wage Order No. 16, section 4(B)'s requirement that an employee be provided a minimum wage for

all "hours worked." (Cal. Code Regs., tit. 8, § 11160, subd. 4(B).) Any time that an employee spends working is compensable as "hours worked"; this includes an on-duty meal period, which by definition is a meal period in which the employee is not relieved of all work obligations. (See *id.*, § 11160, subd. 2(J) [defining " '[h]ours worked,' " in pertinent part, as "the time during which an employee is subject to the control of an employer"]; *Brinker*, *supra*, 53 Cal.4th at p. 1039 ["the defining characteristic of on-duty meal periods is failing to relieve an employee of duty, not simply 'suffering or permitting' work to continue"].) This right to a minimum wage for all "hours worked" derives not from section 10(D), which specifies the circumstances in which paid on-duty meal periods are authorized, but rather from Labor Code section 1194, subdivision (a) and Wage Order No. 16, section 4(B). The right to a minimum wage for all "hours worked" exists independently of any right to an unpaid, off-duty meal period.

This interpretation is also consistent with *Araquistain v. Pacific Gas & Electric Co.* (2014) 229 Cal.App.4th 227 (*Araquistain*) and *Gutierrez, supra*, 50 Cal.App.5th 786. In *Araquistain*, the Court of Appeal considered a CBA that provided that employees working eight-hour shifts were permitted to eat meals during work hours and would not be afforded "additional time therefore at Company expense." (*Araquistain*, at p. 230.) The plaintiffs argued they were entitled to "missed meal payments" when they were unable to take a duty-free meal period. (*Id.* at p. 231.) The Court of Appeal disagreed, holding that the employees waived their right to an off-duty meal period under the CBA, as permitted by Labor Code section 512, subdivision (e), which expressly exempts employees from the meal period requirements of Labor Code

section 512, subdivision (a) when they are covered by a collective bargaining agreement that provides for meal periods. (*Id.* at pp. 234, 236.)

The court explained that a "meal period" provided for in a CBA need not have the same characteristics as the "meal periods" required by the Labor Code. (*Araquistain*, *supra*, 229 Cal.App.4th at p. 234 ["a collectively bargained meal period . . . need not necessarily be a full 30 minutes, begin before the end of the fifth hour of work, *or even be completely free of all employer control*"] (italics added).) Although the italicized language is consistent with our view that collective bargaining agreements may provide for voluntary on-duty meal periods, it does not speak to the issue of compensation. The "meal periods" in *Araquistain* — brief on-duty meal periods — were paid. (*Id.* at p. 230.) The court said this was permissible because unionized employees "are free to bargain over the terms of their meal period, including whether the meal period will be of a specified length and whether employees will be relieved of all duty during that time." (*Id.* at p. 238.) But the court said nothing about whether employees are free to bargain over their right to be paid minimum wage for all hours worked, including the hours of an on-duty meal period.

In *Gutierrez*, the Court of Appeal considered an analogous exemption from Wage Order No. 16, section 5(A)'s requirement that employees be compensated at the regular rate or premium rate for all employer-mandated travel. (*Gutierrez*, *supra*, 50 Cal.App.5th at p. 797.) It concluded the exemption allowed employees to waive the right to compensation at their regular or premium rates of pay, but not their right to compensation at the applicable minimum wage. (*Id.* at pp. 798–799.) The court reasoned that the Wage Order No. 16, section 5(D) collective

bargaining exemption did not "mention, much less override, the separate requirement under Wage Order [No.] 16, section 4(B) that employees receive compensation 'not less than the applicable minimum wage for all hours worked . . . .' " (*Gutierrez*, at p. 798.) Thus, an employer and union cannot bargain away workers' entitlement to be paid a minimum wage for employer-mandated travel time. (*Id.* at p. 804.)

Similarly, the Wage Order No. 16, section 10(E) exemption at issue here neither mentions nor overrides Wage Order No. 16, section 4(B)'s requirement that all workers be paid a minimum wage for all "hours worked." (See Cal. Code Regs., tit. 8, § 11160, subds. 4(B) & 10(D), (E).) The wage order does not purport to limit, nor could it limit, Huerta's right to file a civil action to recover minimum wages "[n]otwithstanding any agreement to work for a lesser wage." (Lab. Code, § 1194, subd. (a).) Thus, Wage Order No. 16 does not foreclose Huerta from seeking compensation for any "hours worked" during an "unpaid meal period" provided by a collective bargaining agreement that exempts the employer from compliance with Wage Order No. 16, section 10(A), (B), and (D).

We next examine under what circumstances an ostensibly off-duty meal period may qualify as compensable "hours worked." In *Bono*, the Court of Appeal held that "[w]hen an employer directs, commands or restrains an employee from leaving the work place during his or her lunch hour and thus prevents the employee from using the time effectively for his or her own purposes, that employee remains subject to the employer's control," and thus the employee must be compensated for that time. (*Bono*, *supra*, 32 Cal.App.4th at p. 975.) We have repeatedly relied on *Bono*'s reasoning in cases interpreting the control clause, and we see no reason we should

not do the same here. (See *Frlekin*, *supra*, 8 Cal.5th at p. 1047 [applying *Bono*]; *Morillion*, *supra*, 22 Cal.4th at p. 583 [same]; *Mendiola*, *supra*, 60 Cal.4th at p. 842 [citing *Morillion*'s application of *Bono*].) In *Brinker*, we cited *Bono* approvingly as "emphasizing absence of duty and freedom from employer control as central to unpaid meal periods." (*Brinker*, *supra*, 53 Cal.4th at p. 1036, fn. 15.) There, we agreed with an opinion of the Division of Labor Standards Enforcement (DLSE) of the Department of Industrial Relations that an unpaid, off-duty meal period requires that the employee "(1) has at least 30 minutes uninterrupted, (2) *is free to leave the premises*, and (3) is relieved of all duty for the entire period." (*Id.* at p. 1036, italics added.)

We hold that even when a qualifying CBA exempts employers from the requirements of Wage Order No. 16, section 10(D), an employee must be paid a minimum wage for meal periods when an employer's prohibition on leaving the premises or a particular area forecloses the employee from engaging in activities he or she could otherwise engage in if permitted to leave. (See *Bono*, *supra*, 32 Cal.App.4th at p. 975.) Under these circumstances, the employee remains under the employer's control despite being relieved of official duties because the employer is restraining the employee from engaging in otherwise feasible activities. (See *ibid*.) Although a meal period's limited duration may impose some practical limitations on employees' freedom of movement, employees must retain the freedom to use the time "for their own purposes" if a meal period is to qualify as off-duty. (*Augustus v. ABM Security Services, Inc.* (2016) 2 Cal.5th 257, 270; see *Brinker*, *supra*, 53 Cal.4th at p. 1036 [" 'The worker must be free to attend to <u>any</u> personal business he or she may choose during the unpaid meal period' "

(quoting Dept. of Industrial Relations, DLSE Opn. Letter No. 1991.06.03 (June 3, 1991))].) Even at remote worksites, there is a meaningful difference between being required to eat at one's workstation or in a designated meal area and being allowed to return to one's personal vehicle or take a walk. In the latter situations, an employee may be able to make personal phone calls, take a nap, or simply enjoy a moment of quiet.

This conclusion accords with the view taken by the DLSE in an opinion letter responding to a claim almost identical to Huerta's. (Dept. of Industrial Relations, DLSE Opn. Letter No. 2001.01.12 (Jan. 12, 2001) p. 1 (DLSE 2001 Opinion Letter); see *Brinker*, *supra*, 53 Cal.4th at p. 1029, fn. 11 [DLSE opinion letters are " ' " ' "not controlling . . . [but] do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance" ' " ' "]; *Morillion*, *supra*, 22 Cal.4th at p. 584 [relying on a DLSE opinion letter to inform its interpretation of the IWC's wage orders].) In the letter, the DLSE addressed an employee inquiry regarding whether an employer could "require[] its employees to remain on its premises during the employees' lunch period" without paying the employees "for the lunch periods in which they are restricted to the employer's premises." (DLSE 2001 Opinion Letter, at p. 1.) Finding the practice was unlawful, the DLSE explained: "[A]ny time during which an employee is prohibited from leaving his or her employer's premises constitutes 'hours worked' under California law, and that such employees are entitled to compensation for those hours worked." (*Ibid*.) The DLSE observed that *Bono* was "precisely on point" and that *Morillion* "expressly approved" *Bono*'s interpretation of "hours worked." (*Id*. at p. 2.) After describing the holdings of those cases, the DLSE concluded that "employees who were not paid for meal

periods during which they were prohibited from leaving the employer's premises, notwithstanding the fact that they were relieved from all duty during those meal periods, are entitled to compensation for their unpaid meal periods." (*Id.* at p. 3.)

On this record, we express no view on whether CSI's restrictions on employee's movement during meal periods prohibited Huerta from engaging in activities he might have otherwise engaged in if permitted to leave. Huerta says he was prohibited from leaving the Site during meal periods and that CSI required him to stay at an assigned lunch area at his daily Installation Site during his meal period. Huerta further states that he could not return to his vehicle "at any time during the workday" without special approval. On the other hand, the distances separating the Installation Site, parking lot, and public road, as well as the speed limit on the access road, might have made travel impractical during Huerta's 30-minute meal period, and the fact that the features of a worksite make travel impractical in the time allotted is not sufficient to establish employer control. (See *Augustus, supra,* 2 Cal.5th at p. 270.) Further evidentiary development may be needed to determine if these impediments, considered in light of the location and characteristics of the Installation Site, meant that employees could not engage in personal activities they would otherwise have been able to engage in absent CSI's prohibitions.

Finally, we hold that if Huerta's "unpaid meal period" is compensable under the wage order as "hours worked," he is entitled to seek compensation for that time under Labor Code section 1194. The statute does not itself provide a substantive basis for bringing a claim for unpaid wages; instead, it authorizes an employee to bring a civil action to recover unpaid wages owed under applicable wage orders. Subdivision (a) of

Labor Code section 1194 provides: "Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit." We have explained that the "statutory and historical context" of this section "shows unmistakably that the Legislature intended the IWC's wage orders to define the employment relationship in actions under the statute." (*Martinez*, *supra*, 49 Cal.4th at 52.) "[S]pecific employers and employees become subject to the minimum wage only under the terms of an applicable wage order, and an employee who sues to recover unpaid minimum wages actually and necessarily sues to enforce the wage order." (*Id.* at p. 57.) The fact that the CBAs specify that Huerta's meal periods are "unpaid" does not defeat an action pursuant to the statute; as noted, the statute by its terms authorizes suit for minimum wages "[n]otwithstanding any agreement to work for a lesser wage," including no wage at all. (Lab. Code, § 1194, subd. (a).)

## CONCLUSION

In response to the Ninth Circuit's certification request, we conclude as follows: First, when an employee is required to spend time on his employer's premises awaiting and undergoing an employer-mandated exit security procedure that includes the employer's visual inspection of the employee's personal vehicle, the time is compensable as "hours worked" within the meaning of Wage Order No. 16.

Second, the time that an employee spends traveling between the Security Gate and the employee parking lots is compensable as "employer-mandated travel" under Wage Order No. 16, section 5(A) if the Security Gate is the first location where the employee's presence is required for an employment-related reason other than the practical necessity of accessing the worksite. Separately, this travel time is not compensable as "hours worked" because an employer's imposition of ordinary workplace rules on employees during their drive to the worksite in a personal vehicle does not create the requisite level of employer control.

Third, when an employee is covered by a collective bargaining agreement that complies with Labor Code section 512, subdivision (e) and Wage Order No. 16, section 10(E), and that agreement provides for an "unpaid meal period," that time is nonetheless compensable under the wage order as "hours worked" if the employer prohibits the employee from leaving the employer's premises or a designated area during the meal period and if this prohibition prevents the employee from engaging in otherwise feasible personal activities. An employee may bring an action under Labor Code section 1194 to enforce the wage order and recover unpaid wages for that time.


**LIU, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Huerta v. CSI Electrical Contractors, Inc.

_____

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**
**Original Proceeding**  XX on request by 9th Circuit (Cal. Rules of Court, rule 8.548)
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S275431
**Date Filed:** March 25, 2024

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Peter R. Dion-Kindem; The Blanchard Law Group and Lonnie C. Blanchard III for Plaintiff and Appellant.

Ford & Harrison, Daniel B. Chammas and Min K. Kim for Defendant and Respondent.

Atkinson, Andelson, Loya, Ruud & Romo, Steven D. Atkinson, Ronald W. Novotny and Kieran D. Hartley for Construction Employers' Association, Southern California Contractors Association and Southern California Association of Scaffold Contractors as Amici Curiae on behalf of Defendant and Respondent.

Simpson, Garrity, Innes & Jacuzzi, Paul V. Simpson and Sarah E. Lucas for the Los Angeles County Chapter, National Electrical Contractors Association as Amicus Curiae on behalf of Defendant and Respondent.

Ogletree, Deakins, Nash, Smoak & Stewart, Robert R. Roginson, Christopher W. Decker and David Szwarcsztejn for Employers Group and California Employment Law Council as Amici Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Peter R. Dion-Kindem
Peter R. Dion-Kindem, P.C.
3856 Davids Road
Agoura Hills, CA 91301
(818) 883-4900

Daniel B. Chammas
Ford & Harrison LLP
350 South Grand Avenue, Suite 2300
Los Angeles, CA 90071
(213) 237-2442